(247 P.3d 1050)
Nos. 102,297
102,663

STATE OF KANSAS, *Appellee*, v. PAMELA SUE HALL, *Appellant*.

Opinion filed February 11, 2011.

- *Ryan Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Drew A. Cummings*, legal intern, *Steven J. Obermeier*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Steve Six*, attorney general, for appellee.

Before GREENE, C.J., GREEN and STANDRIDGE, JJ.

GREEN, J.: Pamela Sue Hall was convicted by a jury of one count of theft and one count of computer crime. Hall was sentenced to a term of 16 months' imprisonment, but she was granted probation for a term of 18 months. As a condition of probation, the trial court ordered restitution. On appeal, Hall contends that the trial court lacked jurisdiction to increase the amount of restitution ordered at Hall's postsentence hearing from the amount of restitution previously ordered at sentencing. We disagree. In addition, Hall asserts that the trial court erred in determining the amount of restitution she owed. We agree. Accordingly, we reverse, vacate the amount of restitution awarded, and remand to the trial court to determine the amount of restitution owed based on the wholesale cost of the crime victim's inventory. Hall also contends that the trial court erred in including the crime victim's auditing expenses as a part of the restitution order. We disagree and affirm on this issue.

Finally, Hall maintains that the trial court abused its discretion in denying Hall's motion for mistrial based on a violation of the order in limine. We disagree and affirm. Accordingly, we affirm in part, reverse in part, vacate in part, and remand with directions.

Dr. Marc and Sue Hardin initially hired Pamela Sue Hall to work as a veterinary technician at their Metcalf 107 Animal Clinic (the Clinic), but they soon realized she lacked the necessary skills for working with animals and limited her to clerical duties. Those du-

ties included scheduling appointments, billing, and data entry from inventory orders using the Clinic's AVImark computer software system, which Hall already knew how to use.

The Clinic had a policy of providing discounted veterinary care and products for employees' pets with the understanding that the employees would pay their bills before receiving their next paychecks. Under this policy, Hall's pets received numerous veterinary services and products valued in excess of $1,000.

After working for the Clinic about 2 months, Hall called Sue Hardin at home late one evening in March 2008 and emotionally pled for an early advance on her paycheck so she could fly to Florida to see her mother, who Hall reported was on life support after suffering a debilitating stroke. Out of empathy and based on Hall's stated plans to return, the Hardins did not verify whether Hall had any outstanding bills before advancing her paycheck.

When a Florida veterinarian later contacted the Clinic's receptionist about refilling Hall's pet's prescription diet, she could not find Hall's pets' records, so the Hardins began to suspect Hall was not returning from Florida after all. Thus, they decided to further investigate Hall's clerical activities at the Clinic.

An audit of Hall's clerical activities on the AVImark system revealed Hall had made numerous improper entries. For example, the Hardins discovered Hall had made changes to inventory counts, overrode product prices, and deleted her pets' medical histories and the outstanding bills for their services on the AVImark system. The Hardins were also unable to locate Hall's pets' x-rays or soap sheets, which were Dr. Hardin's handwritten charts of the care he provided the animals.

The Hardins notified the police of their suspicions of Hall's thefts from the Clinic. Detective Lance Jordan was assigned to investigate their allegations. As a part of his investigation, Jordan called and spoke to Hall, who either denied or offered innocent explanations for the Hardins' allegations against her. For example, Hall admitted she had taken some merchandise from the Clinic without paying, but she said she kept a list of the merchandise and left a note behind. Hall explained that she assumed the Clinic would bill her for the items when they billed her for her pets'

services. Hall denied that she deleted her pets' records or bills or otherwise altered the AVImark system. Rather, she thought any inventory count inconsistencies probably resulted from an inventory reconciliation she worked on with Dr. Hardin.

Jordan followed-up with the Hardins regarding Hall's explanations. Dr. Hardin denied ever working with Hall on inventory. The Hardins also denied that they knew Hall was taking merchandise, that they ever found a sticky note for items she had taken, or that they allowed Hall to run a tab for merchandise.

Jordan also spoke to Colleen and Jack Udell, two of Hall's roommates during the time she worked at the Clinic. The Udells—who were formerly married and living together as roommates along with Hall and Colleen's current husband, Kevin—told Jordan they had seen Hall with numerous items of Clinic merchandise on several occasions. Nevertheless, they had no reason to suspect her of stealing the items until after Colleen took Hall to Florida.

With the help of the Udells—who visited the Clinic and helped compile a list of 72 items of inventory that they had seen in Hall's possession—the audit of the AVImark system, and other internal audits, the Hardins placed the value of the Clinic's missing inventory and Hall's unpaid bills in excess of $1,000.

As a result of Jordan's investigation, the State charged Hall with one count each of theft of property valued between $1,000 and $25,000, in violation of K.S.A. 21-3701, and computer crime in violation of K.S.A. 21-3755.

At Hall's ensuing jury trial, Detective Jordan, the Udells, the Hardins, and an AVImark support technician testified consistent with the earlier mentioned facts. Hall testified in her own defense and also presented testimony from her mother and boyfriend.

Because Hall does not challenge the sufficiency of the evidence to support her convictions in this appeal, a detailed discussion of the evidence contrary to her convictions is unnecessary. Highly summarized, Hall's defense at trial was as follows: She denied the Hardins' accusations about her unpaid bills and pets' missing records; she offered an innocent explanation for the pet supplies the Udells reported were in her possession; she suggested the Clinic's inventory inconsistencies resulted from her inexperience in using

the AVImark system; she opined that the Hardins were accusing her of these crimes because they were hurt after she misled them about her mother's illness and her plans to return from Florida; and she implied that Colleen wanted revenge against her because Colleen learned Hall had slept with her husband (Kevin) when he and Colleen were engaged.

The jury convicted Hall as charged. The trial court later imposed an underlying sentence of 16 months in prison and placed Hall on probation for 18 months, a condition of which was to pay $14,293.11 restitution to the Hardins. We consolidated Hall's separate appeals from her sentencing and the restitution order entered after her post-sentencing challenge to the initial restitution amount of $10,860.38.

This appeal by Hall requires us to determine whether the trial court had jurisdiction to enter its later restitution order. Before reaching this question of jurisdiction, it is necessary for us to set out some additional facts of this case.

Just before pronouncing Hall's sentence, the trial court summarized the facts that would guide its decision, including the fact that the Hardins were seeking restitution in the amount of $10,860.38, as reflected in the presentence investigation report. When the trial court inquired if the parties had any objections to its findings, Hall's counsel objected to the amount of restitution. Hall's counsel said, "I have discussed that briefly, and I think we are going to need to set that up for a hearing, although I will have to get that resolved without presenting any evidence." The court then proceeded to pronounce Hall's sentence.

After pronouncing sentence, the court stated that it was setting restitution at $10,860.38, but it reserved for Hall a chance to challenge that amount. Specifically, the trial court told Hall's counsel, "[I]f your client wishes to challenge that, she should file a motion within 30 days to trigger the Court's jurisdiction to review that, but the burden is on you to file the motion." Hall's counsel responded that a motion would be forthcoming. The journal entry of sentencing reflects restitution due in the amount of $10,860.38. Nevertheless, the journal entry also states in the section for additional

comments: "Court retains jurisdiction over restitution for 30 days for [defendant] to file [motion objecting] to [restitution]."

Within 30 days of sentencing, Hall objected in writing to the amount of restitution. She argued the $10,860.38 restitution amount set at sentencing included the retail cost of the items taken, rather than the items' actual cost, and "[i]f the court were to order restitution in the amount requested by [the] Clinic[,] the victim would accrue a windfall of the difference between the replacement cost and the retail cost." Thus, Hall requested a hearing "to determine the proper amount of restitution necessary to place the victims in the place they were prior to the theft."

At the beginning of the later restitution hearing, Hall's counsel suggested the trial court lacked jurisdiction to consider the State's request for restitution in an amount *exceeding* $10,860.38. The trial court disagreed, explaining that it had kept jurisdiction open on the restitution issue, so it could "go either way."

Sue Hardin testified at length about the retail value of the Clinic's inventory taken by Hall, the value of unpaid services Dr. Hardin provided to Hall's pets, and the extensive amount of time she and another Clinic employee spent in the auditing process. Hall's counsel cross-examined Sue Hardin concerning the Clinic's actual cost of the missing inventory versus its retail value. Moreover, Hall's counsel attempted to discredit Sue Hardin's attribution of the missing inventory to Hall's crimes and her assessment of the amount of time spent in the auditing process.

Sue Hardin's testimony was aided by several exhibits, which included lists, variance reports, bills, and invoices that she collected and prepared during her auditing process. These exhibits were admitted by the court. Nevertheless, at the close of the hearing, the trial court returned the exhibits "to counsel under charge of custody," and directed, "You will retain those in the event of an appeal." It is not clear if the court was addressing the State or Hall's counsel. Regardless, the exhibits are not a part of the record on appeal.

At the conclusion of the restitution hearing, the parties argued their opposing positions on the amount of restitution Hall was obligated to pay for her crimes, using the exhibits to defend their

figures. The State insisted the court should order Hall to pay restitution totaling $14,543.11, which was the full amount requested by the Hardins for the missing inventory, Hall's unpaid bills, and the Clinic's auditing expenses. Hall argued, in pertinent part, that even if the court found that the State had met its burden of establishing by a preponderance of the evidence what inventory was missing as a result of Hall's crimes, she was only required to pay the Clinic's actual cost of the missing inventory. Otherwise, Hall contended that the Hardins would receive a windfall, which contravenes the purpose of restitution.

The trial court rejected Hall's argument and ordered Hall to pay $14,293.11 in restitution. The judge offered the following explanation for how he arrived at that figure:

"Yes, I do accept the retail value because otherwise it would deny the Hardins, as any business, their chance to make a profit on items that they sell. With the theory that the Hardins should be put in the same position before the criminal activity I think would have to deny the $252 for the office visits for the animals, and that being the case that had she not stolen anything, she would have gotten $252 worth of office visits from the Hardins and would have been within their policy to treat employee pets in that manner.

"If we're guided by the notion here that the Hardins are entitled to be put back in a position they should have been but for the criminal activity, then I would delete the [$]252. But I think it has been persuasively established today by the evidence and testimony and the documents that the amount of the loss, [$]14,293.11, this does include the inventory and all the extra work done by the clinic to establish as best they can the amount of loss. I think they did exercise best efforts here in trying to determine what the loss was.

"I'm going to allow the auditing/inventorying fees that were incurred. Ms. Hardin was not able to perform other duties in the clinic because of the need to do the inventory and so on and so forth. So I think it is a proper element of restitution in this case."

### Did the Trial Court Have Jurisdiction To Consider Hall's Objection To the Amount of Restitution Set At Sentencing?

Hall now maintains that because the trial court ordered her to pay a specific amount of restitution at sentencing ($10,860.38), it had no jurisdiction to consider her postsentencing motion objecting to that amount. The State responds that after Hall objected to the $10,860.38 restitution figure, the trial court properly left juris-

diction open and had authority to modify the amount of restitution due as a condition of Hall's probation.

Whether a trial court has jurisdiction is a question of law subject to unlimited review on appeal. See *State v. Ellmaker*, 289 Kan. 1132, 1147, 221 P.3d 1105 (2009).

Hall acknowledges that our appellate courts have recognized a sentencing court may reserve restitution issues for later determination. See *State v. Cooper*, 267 Kan. 15, 17-19, 977 P.2d 960 (1999) (trial court acted within its discretion when it considered State's belatedly filed motion for restitution because trial court had specifically retained jurisdiction at sentencing to decide amount of restitution owed as condition of probation at later date; defendant had notice at sentencing she would be required to pay undetermined amount of restitution; and it was within trial court's discretion to grant additional time to settle restitution issue); *State v. Bryant*, 37 Kan. App. 2d 924, 927-28 163 P.3d 325, *rev. denied* 285 Kan. 1175 (2007) (trial court did not abuse its discretion by conducting hearing to determine amount of restitution defendant owed under K.S.A. 2006 Supp. 21-4603d[e] upon State's motion filed nearly 6 months after court imposed sentence; procedure in K.S.A. 22-3424[d] for restitution hearing before imposing sentence is directory rather than mandatory).

Nevertheless, Hall argues that the cases that have found no abuse of discretion in the court's reservation of jurisdiction to consider restitution after sentencing are distinguishable. According to Hall, the critical fact distinguishing her case from *Cooper* and *Bryant* is the fact that here—unlike the trial courts those cases, which kept the restitution issue *fully* open—the trial court set a *specific amount* of restitution owed as a condition of Hall's probation at sentencing. Thus, Hall argues the trial court had jurisdiction after sentencing only to correct arithmetic or clerical errors in the sentence under K.S.A. 21-4721(i). Accord *State v. Garcia*, 288 Kan. 761, 765-66, 207 P.3d 251 (2009) (sentence effective when pronounced from bench; court lacks jurisdiction to change sentence after pronouncement); *State v. Miller*, 260 Kan. 892, 897, 900, 926 P.2d 652 (1996) (Kansas Sentencing Guidelines Act eliminated court's statutory power to modify sentence already imposed).

Stated another way, Hall contends that the trial court had no jurisdiction to consider her postsentencing objection to the restitution amount because she sought an improper modification of her sentence, not a mere correction in an arithmetic or clerical error.

In support, Hall relies on *State v. Trostle*, 41 Kan. App. 2d 98, 201 P.3d 724 (2009). In *Trostle*, this court held that after imposing a 1-year jail sentence for the defendant's felony driving under the influence conviction, the trial court could not reserve jurisdiction to consider a motion for alternative sentencing after the defendant served 9 months of that sentence. 41 Kan. App. 2d at 101-03. Hall suggests *Trostle* is analogous because in her case the trial court improperly attempted to reserve jurisdiction to modify the specific amount of restitution set at sentencing.

*Trostle* is distinguishable. The *Trostle* court held that the modification of the *length of the defendant's sentence* was improper because a sentence imposed under the Kansas Sentencing Guidelines cannot be modified after sentencing is complete; only arithmetic or clerical errors may be corrected. See K.S.A. 21-4721(i) (correction of arithmetic or clerical errors in sentence allowed); *Miller*, 260 Kan. at 897, 899-900.

Restitution, on the other hand, is not a part of the punishment or sanction for a defendant's conduct; it is to make the victim whole again from a loss or damage resulting from the defendant's crime. See K.S.A. 21-4603d(2). It also serves the functions of deterrence and rehabilitation of the guilty. *State v. Applegate*, 266 Kan. 1072, 1075, 976 P.2d 936 (1999). As our Supreme Court has recognized, "[r]estitution imposed as a condition of probation is not a legal obligation equivalent to a civil judgment, but rather an option which may be voluntarily exercised by the defendant to avoid serving an active sentence." 266 at 1075.

No Kansas decision has been cited to us nor have we found one that decides this specific issue or question: whether a trial court may retain jurisdiction to reconsider the specific amount of restitution ordered at sentencing if an objection is later filed by the defendant to the amount of restitution initially ordered. In other words, may the trial court provisionally retain jurisdiction to modify the amount of restitution ordered at sentencing if the defendant

objects, within the time allotted by the trial court, to the amount of restitution initially ordered?

The State argues that the trial court's procedure was proper because K.S.A. 2010 Supp. 21-4603d(b)(1) and K.S.A. 21-4610(d)(1)—which govern restitution orders—control over the general sentencing provision of K.S.A. 21-4721 interpreted in *Trostle*, and those statutes grant a trial court wide latitude in setting restitution.

Indeed, K.S.A. 2010 Supp. 21-4603d(b)(1) and K.S.A. 21-4610(d)(1) authorize or require an order of restitution as a condition of probation, but they do not specify the *procedure* for entering such orders, which appears to be the ultimate issue here.

Instead, K.S.A. 22-3424(d) governs the procedure for restitution hearings. That statute directs, in pertinent part:

"If the verdict or finding is guilty, upon request of the victim or the victim's family and before imposing sentence, the court shall hold a hearing to establish restitution. The defendant may waive the right to the hearing and accept the amount of restitution as established by the court." K.S.A. 22-3424(d).

See *Bryant*, 37 Kan. App. 2d at 930-931 (holding procedure set forth in K.S.A. 22-3424[d] is directory rather than mandatory; "[a]s long as the defendant is notified at sentencing that restitution is being ordered by the district court in an amount to be determined at a later time, then the purpose of the statute has been satisfied. The statute does not contain negative language prohibiting the district court from determining the amount of restitution in another manner or at another time.").

Here, the trial court arguably interpreted Hall's counsel's stated intent to file a motion objecting to the $10,860.38 restitution figure as a *potential* waiver to the right to a restitution hearing under K.S.A. 22-3424(d). When the court announced restitution due of $10,860.38 as a condition of Hall's probation, neither the Clinic nor the State had requested a hearing. It seems that the trial court accepted the amount of restitution sought by the Hardins (as stated in the presentence investigation report), but it left open the opportunity for Hall to request a restitution hearing. Stated another way, to assure that Hall's procedural due process rights were pro-

tected, the trial court gave Hall two options: (1) She could waive her right to a restitution hearing and accept the $10,860.38 restitution amount established by the court; or (2) she could file a motion requesting a restitution hearing where the court would consider the proper amount of restitution due, whether more or less. Hall chose option 2. Once she did so, the trial court could conduct a hearing to determine the proper amount of restitution.

As a result, we determine that the trial court had jurisdiction to consider Hall's postsentencing objection to the amount of restitution set at sentencing as a condition of her probation.

*Did the Trial Court Err In Determining the Amount of Restitution Hall Owed?*

Hall's second challenge to the trial court's restitution order involves two separate issues. First, Hall argues that the trial court erroneously ordered her to pay the Hardins the retail value of the inventory, which resulted in a windfall to the Clinic. Hall maintains that she should have to pay restitution only for the Clinic's actual cost for the inventory. Second, Hall contends that the evidence was insufficient to support the trial court's inclusion of the Clinic's auditing expenses in the amount of restitution.

These two issues will each be considered in turn below. Before addressing the first issue, we focus on the law governing the trial court's restitution order and the appellate standards for review of restitution orders.

There is no dispute that the trial court could order Hall to pay restitution as a condition of her probation under K.S.A. 21-4610(d)(1), which provides in pertinent part:

"(d) In addition to any other conditions of probation, . . . the court shall order the defendant to comply with each of the following conditions:
(1) Make reparation or restitution to the aggrieved party *for the damage or loss caused by the defendant's crime*, in an amount and manner determined by the court and to the person specified by the court." (Emphasis added.)

See also *Applegate*, 266 Kan. at 1079 (recognizing "[t]he measure of reparation or restitution to be ordered, pursuant to K.S.A. 21-4610[d][1], is the amount that reimburses the victim for the *actual loss suffered*." [Emphasis added.]); *State v. Casto*, 22 Kan. App. 2d

152, 154, 912 P.2d 772 (1996) (property crime victim entitled to restitution only up to amount of his or her actual loss).

Our courts have held that an item's fair market value is the usual standard for calculating restitution for a victim's loss of, or damage to, the item as a result of the defendant's crime. See, *e.g.*, *State v. Maloney*, 36 Kan. App. 2d 711, 714, 143 P.3d 417, *rev. denied* 282 Kan. 794 (2006); *State v. Baxter*, 34 Kan. App. 2d 364, 365, 118 P.3d 1291 (2005); *State v. Rhodes*, 31 Kan. App. 2d 1040, Syl. ¶ 2, 77 P.3d 502 (2002). This court has defined an item's fair market value in considering restitution as "the price that a willing seller and a willing buyer would agree upon . . . in an arm's-length transaction." *Baxter*, 34 Kan. App. 2d at 366. *Cf. City of Mission Hills v. Sexton*, 284 Kan. 414, Syl. ¶ 5, 160 P.3d 812 (2007) (characterizing K.S.A. 26-513[e]'s definition of "fair market value" for purposes of measuring compensation due in eminent domain proceeding as: "under the commonly understood definition: the amount in terms of money that a well-informed buyer is justified in paying and a well-informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion"). Where the fair market value cannot readily be determined, a court may properly consider other factors, including the item's purchase price and condition, so long as the valuation is based on reliable evidence which yields a defensible restitution figure. *Maloney*, 36 Kan. App. 2d 711, Syl. ¶ 5.

*Standard of Review*

In discussing orders of restitution under K.S.A. 21-4610(d)(1), our Supreme Court has stated:

"The amount of restitution and manner in which it is made to the aggrieved party is to be determined by the court exercising its judicial discretion and is subject to abuse of discretion review. [Citation omitted.] 'Although the rigidness and proof of value that lies in a civil damage suit does not apply in a criminal case, the court's determination of restitution must be based on reliable evidence which yields a defensible restitution figure.' [Citation omitted.] Because [K.S.A. 21-4610(d)(1)] limits the imposition of restitution to 'damage or loss caused by the defendant's crime,' the question of whether an item claimed by the aggrieved party as loss qualifies for inclusion in a restitution order because it was caused by

the defendant's offense is a question of law. [Citation omitted.]" *State v. Hunziker*, 274 Kan. 655, 660, 56 P.3d 202 (2002).

Hall purports to limit her initial challenge to the trial court's legal conclusion that she should pay restitution in the amount of the inventory's retail value. In other words, Hall argues that the Clinic's expected profits on the inventory she was convicted of taking did not qualify for inclusion in the restitution order. This court has de novo review over that question of law. See 274 Kan. at 660.

*What is the "Fair Market Value" of the Inventory Hall Was Convicted of Taking?*

Hall's first argument requires a determination of the Clinic's inventory's "fair market value." To reiterate, the fair market value of the inventory is "the price that a willing seller and a willing buyer would agree upon . . . in an arm's-length transaction." *Baxter*, 34 Kan. App. 2d at 366.

Through leading questions by the State at the restitution hearing, the Hardins equated the missing inventory's fair market value with its retail value. As quoted above, the trial court agreed with this assessment, concluding that "otherwise it would deny the Hardins, as any business, their chance to make a profit on the items that they sell."

Hall counters that she should be limited to paying the Hardins the actual cost they paid for the Clinic's inventory. She contends that to force her to pay restitution for "speculative 'profits' on items appropriated from inventory" bestows a windfall upon the Clinic because it can "replace the same items and earn a second profit from the same."

As stated earlier, to assess the appropriate amount of restitution, our courts have generally held that an award of restitution that exceeds the fair market value of an item constitutes an abuse of discretion. See, *e.g.*, *Hunziker*, 274 Kan. at 664; *Baxter*, 34 Kan. App. 2d at 366; *Rhodes*, 31 Kan. App. 2d at 1042-43; *Casto*, 22 Kan. App. 2d at 154; *State v. Hinckley*, 13 Kan. App. 2d 417, 419, 777 P.2d 857 (1989).

"Although the rigidness and proof of value that lies in a civil damage suit does not apply in a criminal case, the court's deter-

mination on restitution must be based on reliable evidence which yields a defensible restitution figure." *Casto*, 22 Kan. App. 2d at 154. Nevertheless, in the absence of direct authority, we must draw some guidance from civil law in determining if the trial court's calculation of restitution based on the retail market value of Hardin's inventory yields a defensible restitution figure. In *Illinois Cent. R. Co. v. Crail*, 281 U.S. 57, 50 S. Ct. 180, 74 L. Ed. 699 (1930), the United States Supreme Court had to decide whether the plaintiff should be compensated based on the wholesale market price of coal instead of the retail market price. The plaintiff, an established coal dealer, purchased at wholesale prices a carload of coal at $5.50 per ton plus $3.30 per ton freight charges, which it proposed to resell for $13 per ton to its retail customers. The rail carrier of the plaintiff's coal cargo arrived at the delivery point with a shortage of 5,500 pounds of coal. When the delivery was made, the plaintiff had not contracted to sell any of the coal and intended to simply add the coal to his current inventory. The plaintiff sued, maintaining that it should be awarded the $13 per ton retail value of the undelivered coal. Noting that the plaintiff purchaser "lost no sales by reason of [the delivery shortage]," and finding that plaintiff could have purchased the missing coal at the $5.50 per ton wholesale price, the Court awarded damages based on the wholesale market price. See 281 U.S. at 63-65.

Like the plaintiff in *Illinois Central*, the Clinic purchased its inventory at an amount less than the retail value. The State's argument and trial court's ruling incorrectly identifies the seller and the buyer in the arms-length transaction as the Clinic and its retail customers. Instead, the relevant seller and the buyer are the wholesalers or vendors of the inventory and the Clinic. Stated another way, the actual loss suffered here is the fair market value (the wholesale market price) that *the Clinic*, as the victim, paid for the items taken by Hall, not the amount the Clinic would have received had its customers been able to purchase that inventory at retail prices. Moreover, similar to the plaintiff in *Illinois Central*, there is no showing that the Clinic had earned a retail profit because no evidence was presented that the Clinic had contracted to sell any of the missing inventory at retail prices. See 281 U.S. at 63-65.

This conclusion is logical because there was no evidence presented that the Clinic could not replace its missing inventory at wholesale prices, as opposed to retail prices. To summarize, the Clinic purchased its inventory at wholesale. If the Clinic replaces its missing inventory at similar wholesale prices, the Clinic will not lose retail sales because of the missing inventory. As a result, the trial court's awarding retail prices to the Clinic does not produce a fair result because it gives the Clinic a windfall.

Finally, in arguing that the retail value was the proper measure of restitution, the State points out that the Hardins had been unable to replace some of the missing inventory because it had been purchased on a revolving account. But again, Hall is only responsible for restitution for the loss suffered by the Clinic as a result of her crimes. See *Hunziker*, 274 Kan. at 660 (victim entitled to restitution only up to the amount of actual loss caused by defendant's crime). If restitution is set at the amount of the inventory's wholesale cost, the Clinic can replace the inventory, whether by purchasing it directly or on account, and sell the inventory at retail prices.

Granted, our courts have recognized that lost profits may come into play under the *civil law* when the item of personal property lost by the victim as a result of the defendant's crime has no market value. See *Maloney*, 36 Kan. App. 2d at 714-15 (recognizing that under civil law "when measuring damages to personal property where the item has no market value, other relevant factors must be considered such as the cost of repair, the original value, the loss of use, any special value to the owner, the loss of expected profits, and the cost of replacement). Here, though, the property lost by the Clinic has a readily discernable market value—the wholesale price that the Clinic paid to procure the items.

Accordingly, we determine that the trial court's basing restitution on the inventory's retail market value, as opposed to the Clinic's wholesale cost for the inventory, failed to yield a defensible restitution figure. We reverse, vacate the amount of restitution, and remand to the trial court to redetermine the amount of restitution consistent with this opinion.

*Is the Record Sufficient For this Court To Determine the Proper Amount of Restitution?*

Unfortunately, the exhibits offered during Sue Hardin's testimony that apparently reflected the Clinic's cost for the inventory are not a part of the record on appeal, so it is not clear what portion of the trial court's restitution order is attributable to the retail cost of the inventory versus its wholesale cost. Hardin's testimony from those exhibits about the difference between the Clinic's actual cost for the inventory and its retail cost is difficult to follow without those exhibits. Hall's counsel did place the wholesale cost at $4,523.50 in arguing the court should award only that amount, but when asked if that amount was the inventory's wholesale cost during her testimony, Sue Hardin mentioned figure of $5,665.58.

Because this court cannot discern the correct amount of restitution due from the current record, the trial court's restitution order must be vacated and the matter remanded for recalculation of the amount of restitution due using the Clinic's wholesale cost for the inventory instead of its retail cost.

*Was the Evidence Sufficient To Support the Trial Court's Inclusion of the Clinic's Auditing Expenses as a Part of the Restitution Order?*

This leads us to Hall's second challenge to the amount of restitution, that is, that the evidence was insufficient to support the trial court's inclusion of the Clinic's auditing expenses in the amount of restitution.

"Although the rigidness and proof of value that lies in a civil damage suit does not apply in a criminal case, the court's determination of restitution must be based on reliable evidence which yields a defensible restitution figure." *Casto*, 22 Kan. App. 2d at 154.

At issue is the Hardins' request at the restitution hearing that Hall pay restitution for the amount of time Sue Hardin and another Clinic employee spent in auditing the inventory and the AVImark system to determine the extent of the Clinic's loss. During her testimony, the State asked Sue Hardin to estimate the time spent in the auditing process. Sue Hardin replied that she spent 88 hours at $15 per hour, and her employee spent 24 hours at $10 per hour.

During cross-examination, Sue Hardin said she logged the hours spent on the audit in her journal, but she did not bring the journal with her to the hearing.

Hall now argues on appeal that since Sue Hardin only estimated the amount of hours spent in the audit and she failed to bring the journal or employment records of the employee that helped her with the audit, there is no reliable evidence to support the trial court's order that Hall pay the Clinic's audit expenses as part of restitution.

The State counters that Sue Hardin's testimony about the time spent was sufficient. In support, the State cites *State v. Bausch*, 29 Kan. App. 2d 649, 29 P.3d 489, *rev. denied* 272 Kan. 1420 (2001). In *Bausch*, a panel of this court held the cost of an audit is properly included as part of restitution when it is a reasonable consequence of the defendant's crime. 29 Kan. App. 2d 649, Syl. ¶ 3. *Bausch* also held that the evidence was sufficient to support the court's inclusion of the audit expense in restitution despite the victim's testimony that she could " 'only estimate' " the time spent investigating the defendant' theft. 29 Kan. App. 2d at 651.

We adopt the reasoning of *Bausch* to conclude that Sue Hardin's testimony about the estimated time spent on the audit and its value was reliable evidence to support the trial court's inclusion of the a defensible figure for the Clinic's auditing expenses in the restitution order.

*Did the Trial Court Abuse Its Discretion In Denying Hall's Motion For Mistrial Based On a Violation of the Order In Limine?*

In her third and final issue on appeal, Hall seeks a new trial because the State admitted evidence that the Udells also suspected Hall had stolen some items from their home, which violated a pretrial order in limine prohibiting such evidence and the court failed to give a limiting instruction after that evidence was admitted. The State responds that any violation of the order in limine was unsolicited and inadvertent; any error in admission of the evidence did not substantially prejudice Hall's right to a fair trial, particularly in light of the overwhelming evidence of her guilt; and Hall did not request a limiting instruction.

*Standard of Review*

In reviewing an alleged violation of an order in limine, this court must decide the following: (1) Was the order in limine violated? and, if so, (2) did the violation substantially prejudice the defendant? The defendant bears the burden of establishing substantial prejudice resulting from the admission of evidence in violation of an order in limine. See *State v. Crum*, 286 Kan. 145, 160, 184 P.3d 222 (2008); see also *State v. Galloway*, 268 Kan. 682, 693-96, 1 P.3d 844 (2000) (discussing cases analyzing whether defendants were substantially prejudiced by admission of evidence in violation of orders in limine); *State v. Maybin*, 27 Kan. App. 2d 189, 196, 2 P.3d 179, *rev. denied* 269 Kan. 938 (2000) (citing K.S.A. 22-3423[b] and [c] for permissive allowance for trial court's declaration of mistrial when either a legal defect in the proceedings would make judgment reversible as matter of law and defendant requests or consents to such declaration or prejudicial conduct makes it impossible to proceed with trial absent injustice to either defendant or prosecution).

The parties essentially agree that the evidence at issue was inadmissible and violated the order in limine. Consequently, the sole issue is whether the violation substantially prejudiced Hall. Because the trial court is in the best position to evaluate the degree of prejudice suffered by a defendant upon the violation of an order in limine, we review its denial of a motion for mistrial based on a violation of an order in limine for an abuse of discretion. See *Crum*, 286 Kan. at 160.

*Did the Trial Court Abuse Its Discretion in Denying Hall's Motion for Mistrial?*

Before addressing Hall's argument, some additional background is necessary. Just before trial, Hall filed a motion in limine, seeking, in pertinent part, to exclude evidence about the Udells' belief that Hall was also responsible for items allegedly missing from their home. At the pretrial conference held the week before trial, a pro tem judge granted Hall's motion after the State noted it had no intention of introducing such evidence unless it became necessary for impeachment or rebuttal.

Despite the order in limine, during Detective Jordan's direct testimony at trial in support of the State's case-in-chief, the following brief exchange took place:

"Q.    When you were talking to Jack and Colleen Udell, was there any issues of hard feelings that they would have had with the defendant?

"A.    Not at all. Other than at one point, they believed they were missing some belongings from their house, and they thought she was probably responsible for that."

Hall's counsel immediately objected, after which the following bench conference took place outside the jury's hearing:

"[Hall's counsel]: This witness is unaware of the motion [order] in limine. I believe that this is prejudicial and can be not cured with an instruction. I request a mistrial.

"[Prosecutor]: Judge, Colleen Udell has already testified that she was upset because she believed that the defendant had taken some items from the home. That door was opened. That was opened by—

"[Hall's counsel]: She did not testify to that.

"[Prosecutor]: Yes, she did.

"[Hall's counsel]: I can look at the record.

"[Prosecutor]: I believe that she testified that she was mad at them. I believe a limiting instruction is more than appropriate.

"[Hall's counsel]: No.

"THE COURT: I don't intend to draw any more attention to this. Move on to a different subject matter."

No further evidence about the Udells' suspicions that Hall had also stolen from them was offered, but Hall did challenge this violation of the order in limine twice more: first, in her oral motion for mistrial renewed after the State rested its case, and again in her written motion for new trial. In both instances, the trial court denied Hall's motions, finding Jordan's brief and inadvertent reference to the inadmissible evidence was not intentionally elicited by the State and did not unfairly or unduly prejudice Hall.

Hall now argues on appeal that she was substantially prejudiced by the admission of this evidence because credibility was a key issue in her trial. Specifically, Hall suggests the evidence unfairly weakened her defense that Colleen Udell's credibility was questionable because she was jealous and seeking revenge after Hall had an affair with her husband. Hall argues that Jordan's statement

"showed that the Udells had also suffered some possible losses due to Ms. Hall's dishonesty." Hall further contends that, when combined with Sue Hardin's testimony about Hall's betrayal of her trust and empathy when she lied about her mother's health, this evidence about her possible theft from the Udells "encouraged the jury to speculate as to Ms. Hall's proclivity for taking things from people that trusted her as an employee or close friend."

In response, the State first points out that any bias the Udells may have had was admissible (citing *State v. Abu-Fakher*, 274 Kan. 584, 600-01, 56 P.3d 166 [2002]).

The State also cites several cases where our courts have held that the trial court did not abuse its discretion in refusing to grant a mistrial when evidence was admitted in violation of orders in limine. For example, in *Galloway*, our Supreme Court concluded that a witness' unsolicited brief mention that the defendant had previously been in prison for murder—which, per the parties' agreement, the trial court instructed jury was not true—did not, by itself, prejudice the defendant's right to fair and impartial trial. 268 Kan. at 690-93, 696-97. Likewise, in *Maybin*, 27 Kan. App. 2d at 196-97, this court cited the parallel facts in *State v. Rinck*, 256 Kan. 848, 853, 888 P.3d 845 (1995), to conclude that the trial court did not err in denying the defendant's motion for a mistrial where a witness' testimony about the defendant's criminal history in violation of an order in limine was not solicited by the prosecution; the defendant did not take the trial court up on its offer for a limiting instruction; and there was no further mention of the improper evidence.

Here, as in the *Galloway, Maybin,* and *Rinck* cases relied upon by the State, Detective Jordan's testimony about the Udells' belief that Hall may have stolen from them was unsolicited; there was no further mention of it at trial; and there was substantial evidence of Hall's guilt. Accordingly, we determine that the trial court properly denied Hall's motion for mistrial based on the admission of this brief comment by Jordan about the Udells' suspicions.

*Did the Trial Court Clearly Err In Not Instructing the Jury To Disregard the Evidence?*

In her brief argument regarding the lack of a limiting instruction, Hall maintains that the trial court's failure to give a limiting instruction "left the jury with the impression that it was proper to consider this information when assessing Ms. Hall's credibility under the general PIK witness credibility instruction." In support, Hall cites *State v. Gunby*, 282 Kan. 39, Syl. ¶ 4, 144 P.3d 647 (2006), which discussed the requirement of an instruction limiting the jury's consideration of evidence admitted under K.S.A. 60-455.

Importantly, neither party argued below—nor do they argue on appeal—that this evidence was admissible under K.S.A. 60-455. Thus, an instruction limiting the jury's consideration of the evidence as allowed for under K.S.A. 60-455 would not have been proper.

Assuming Hall's complaint is instead that the jury should have been instructed to wholly disregard the evidence because she did not request or object to the omission of such a curative instruction, this court is limited to determining if omission of a curative instruction was clearly erroneous. See K.S.A. 22-3414(3); *State v. Martinez*, 288 Kan. 443, 451, 204 P.3d 601 (2009). A reviewing court will find a trial court clearly erred only if it "is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." 288 Kan. at 451-52.

When determining whether clear error has occurred, our Supreme Court had stated that "rather than attempting to assess the quantity and quality of all of the evidence of guilt presented during the trial, a more useful approach is to focus on the potential impact of the specific evidence in question." *State v. Hunt*, 285 Kan. 855, 868, 176 P.3d 183 (2008).

Hall does not suggest—and nothing in the record supports a conclusion—that the trial court's refusal to draw more attention to this brief, inadvertent, unsolicited testimony from Detective Jordan by giving a curative instruction would have had such an influence on the jury that it would have rendered a different verdict. Accordingly, we cannot conclude that the trial court's failure to give a curative instruction was clearly erroneous.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.