IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,262

STATE OF KANSAS,
*Appellee*,

v.

GUSTIN BROWNLEE,
*Appellant*.


SYLLABUS BY THE COURT


1.

On the record in this case, the State has failed to establish that the district court judge was aware of a hold placed on a jailed defendant at the time his statutory right to trial within 90 days from arraignment was under consideration.


2.

The "entire record," as that phrase is used in Supreme Court Rules 3.01 and 3.02 (2014 Kan. Ct. R. Annot. 20), includes all original papers and exhibits filed in the district court, the court reporter's notes and transcripts of proceedings, any other court-authorized record of the proceedings, and the entries on the appearance docket. It does not include a warrant and report never filed in the district court.


3.

A parole hold issued by the Kansas Department of Corrections is not a specific fact or proposition "of generalized knowledge [amenable to] immediate and accurate determination by resort to easily accessible sources of indisputable accuracy" under K.S.A. 60-409(b)(4), and it is not appropriate for judicial notice.

4.

Failure to allow the defendant to be present at a motion hearing in this case was error under K.S.A. 2014 Supp. 22-3208(7), and the defendant did not acquiesce in a continuance sought by defense counsel at that hearing. The delay caused by the continuance should not have been counted against the defense for purposes of statutory speedy trial calculation.

5.

The amendment to the speedy trial statute codified at K.S.A. 2012 Supp. 22-3402(g) is a procedural provision that may be applied retroactively to a defendant whose crime was committed before the amendment took effect.

6.

Under K.S.A. 2012 Supp. 22-3402(g), the legislature, which created the statutory right to trial within 90 days from arraignment for a defendant held in jail solely as a result of the charges at issue, has decided to eliminate the remedy for its violation in certain circumstances. The defendant in this case is not entitled to reversal of his convictions and dismissal of this action under the plain language of this subsection of the statute.

7.

An instruction on the lesser included offense of voluntary manslaughter was not factually appropriate on the evidence in this case.

8.

On the record of this case, the prosecutor's remarks about premeditation did not exceed the wide latitude allowed in discussing the evidence. They did not misinform the jury on whether premeditation can arise in an instant, and they correctly pointed out

2

factors that can give rise to an inference of premeditation, including a break between series of shots, the existence of defensive wounds, and the continuation of shooting after the victim had fallen to the ground.

9.

Fleeting improper testimony from a detective about the defendant's prior possessions of firearms and from a firearms expert about testing of a gun unrelated to the crimes charged, regardless of whether considered singly or together, did not require the district judge to grant a motion for mistrial or a motion for new trial. The evidence of the defendant's guilt in this case was overwhelming, and the improper testimony could not have resulted in substantial prejudice to the defense.

10.

Cumulative error does not require reversal of the defendant's convictions in this case.

Appeal from Wyandotte District Court; WESLEY K. GRIFFIN, judge. Opinion filed August 7, 2015. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Jennifer S. Tatum*, senior assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with her on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Gustin Brownlee appeals his jury trial convictions of first-degree premeditated murder and criminal possession of a firearm, which arose out of the

3

fatal shooting of Tony "Black" Irvin at a party in April 2012. Brownlee contends that (1) his statutory right to a speedy trial was violated, necessitating dismissal of this case; (2) the jury should have been instructed on the lesser included offense of voluntary manslaughter; (3) the prosecutor committed misconduct during closing argument; (4) a mistrial or a new trial was necessary because of improper testimony by State witnesses; and (5) cumulative error compels reversal.

As detailed below, we ultimately reject Brownlee's contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On the day of the shooting, John Doran lived with his girlfriend, Brandie Brownlee; Brandie's four minor children; Brandie's adult child, Dyran Robinson; and Doran's son-in-law, Kenneth Brinson. Doran invited some friends over to watch a boxing match on television. In addition to those who lived with Doran, the party guests included Doran's uncle, William Jackson; Doran's nephew, Michael Thompson; Brandie's two sisters, Shaella and Erin; Brandie's cousins, Nicki and Shonda; and Irvin. Irvin, Brinson, Thompson, Doran, and Brandie had been there at Doran's residence all day. The other guests started arriving at 8 or 9 p.m. Gustin Brownlee, who is the brother of Brandie, Shaella, and Erin, arrived at 10:30 or 11 p.m. The children were upstairs while the adults were in the basement of the house.

At about 2 a.m., police officers were dispatched to the house, where they discovered Irvin lying face down in the driveway, dead from apparent gunshot wounds. Coroner Altaf Hossain later performed an autopsy and eventually would testify that Irvin's body had nine bullet entry wounds, including two in the back and seven in the front. Six of the wounds would have been fatal, and one wound to the back of Irvin's head alone could have caused his death instantly. Irvin also had possible defensive wounds on

4

his right forearm. Kansas Bureau of Investigation (KBI) firearm expert Zachary Carr eventually would testify that 15 of 16 fired cartridge cases found at the crime scene came from the same firearm.

Brandie gave a recorded statement to police at about 6 a.m. the morning after the shooting. She told officers that Irvin touched her disrespectfully, and they had an argument. Brownlee and Doran convinced her to calm down, and the men went outside. Brandie and Doran then went upstairs but could hear Brownlee and Irvin arguing in the basement. Irvin left the house but said he would be back to hurt Brownlee. Apparently Brownlee then also left the house. When Brandie tried to bring Brownlee back inside, he pulled out a gun and fired three shots into the ground. Brownlee and Irvin started arguing again, and Brownlee shot Irvin multiple times. Brandie said she did not know if anyone else at the party had a gun.

Detective Clayton Bye also interviewed Shaella, Erin, and Doran that day. He also later interviewed Jackson and Thompson. Doran, Jackson, and Thompson also identified Brownlee as the person who shot Irvin.

Brownlee was arrested on May 23, 2012, and was charged with first-degree murder and criminal possession of a firearm. The parties do not dispute that Brownlee was held in jail pending trial. James Colgan was appointed as defense counsel. After a hearing set for June 5 was continued twice, Brownlee filed a July 12 pro se motion invoking what he said was his federal constitutional right to trial within 90 days.

On September 12, District Judge Ernest L. Johnson presided over Brownlee's preliminary hearing. The defense waived formal arraignment. The judge noted, "Speedy trial is running. And I know that Mr. Brownlee has already filed his notice that he wants his speedy trial." A pretrial conference was set for September 28, 2012.

On September 28, Colgan appeared before District Judge Wesley K. Griffin. Brownlee was not present. The journal entry of the hearing states: "This pretrial conference will be continued by the defendant in order for the defendant to retain counsel. This matter will be continued until October 26, 2012 at 10:30. Time is assessed versus the defendant." On October 26, 2012, Judge Griffin set a status hearing for October 31.

Both Brownlee and Colgan were present at the October 31 hearing before Judge Griffin. The judge repeated that the time between September 28 and October 31 was assessed to the defense because of the request to retain counsel. This meant that 74 days remained on Brownlee's 90-day speedy trial deadline, which would require trial to begin by January 8, 2013. Defense counsel agreed with this calculation, and the judge set a January 7, 2013, trial date.

At a December 18 hearing with Brownlee present, Colgan informed Judge Griffin that Brownlee had filed a second pro se motion for speedy trial. After argument before this court, Brownlee added the document defense counsel had described as Brownlee's second motion to the record on appeal. The notarized document says only: "Dear Mr. Griffin I do not understand why my 90 day speedy trial has been delayed. Sincerely Gustin C. Brownlee." The judge asked if Brownlee had another hold to keep him in jail, and Colgan said no. The State did not attempt to contest or correct this statement.

Brownlee did not believe that the time between September 28 and October 31 should be assessed to him. He explained that he had told Colgan he was not sure if lawyer KiAnn McBratney was getting involved in his case, and he had wanted Colgan to set a trial date at the September hearing. Colgan responded that he did not think he could schedule a trial for another attorney. The district court agreed, and the judge said he

6

personally remembered talking to McBratney about October 26 and learning she was not going to be involved in Brownlee's case. This time the judge assessed September 28 to October 26 to the defense but did not charge the continuance from October 26 to October 31 against the defense.

Colgan informed the judge that he had a scheduling conflict with a January 7, 2013, trial date and that Brownlee was unhappy with him. The judge warned Brownlee that appointment of a new attorney would mean Brownlee would not be able to go to trial on January 7. Brownlee asked the judge for an opportunity to think about this until January 4, the date set for the next hearing.

On December 31, 2012, Colgan moved to withdraw, alleging Brownlee would not reveal essential information about the case. At the January 4 hearing, Colgan renewed his request to be removed. Brownlee told Judge Griffin that he wanted to represent himself and go to trial on January 7. The judge tried to dissuade Brownlee and said that neither a new attorney nor Brownlee could possibly be prepared to go to trial in 3 days. Brownlee insisted, and the judge agreed to appoint a standby attorney to enable Brownlee to represent himself. Brownlee asked for McBratney as the standby. McBratney was appointed standby counsel, but the judge said other trial settings meant Brownlee's trial could not begin until January 28.

Trial began as expected on January 28, 2013. As it opened, McBratney informed Judge Griffin that she would be representing Brownlee, who would "simply play the role of the defendant."

The prosecutor and the defense agreed that witnesses who had told police that Brownlee had possessed guns at times before the Irvin killing should not be permitted to testify on that point at trial. The prosecutor promised to admonish the witnesses in

7

advance, and the judge agreed with this course of action. Still, the following exchange took place between Bye and the prosecutor:

"Q. At that point were you starting to hear some common themes between the statements?
"A. Oh definitely.
"Q. Can you give us an example?
"A. Early on tried to find out everybody that had a gun. No one ever said anyone besides Gustin had a gun, no one ever said anyone besides Gustin shot a gun. No one said anyone besides Gustin killed Mr. [Irvin]. Several people said they [had] seen Gustin with a gun in the past."

Defense counsel asked for a mistrial, arguing the detective was a professional who should have known better than to mention Brownlee's past gun possessions. She did not want the jury admonished because she feared it would only draw more attention to the detective's statement. The prosecutor said the detective was the only State witness she had not reminded not to testify about Brownlee's past gun possessions because she also thought the detective knew better than to bring the subject up. She nevertheless argued a mistrial was unnecessary because the jury would know Brownlee was prohibited from having a gun the day of the party because it would be instructed about his prior felony. The judge stated the prosecutor's question had not been designed to elicit an inappropriate answer and took the motion for mistrial under advisement.

Also on the first day of trial, the prosecutor informed the judge that a 9mm gun recovered as a result of a burglary investigation involving Brownlee's relative had been sent to the KBI that morning for testing. The prosecutor acknowledged that evidence about the gun would be irrelevant if testing showed the casings found at the scene of Irvin's killing did not match. Nevertheless, the following exchange between the prosecutor and firearm expert Carr occurred during Carr's direct examination:

8

"Q.  Now you didn't have a firearm to test in this case, correct?

"A.  Not originally, no, ma'am.

"Q.  And that's not unusual, is it?

"A.  No, it's not."

The defense lodged no contemporaneous objection to Carr's response suggesting a gun was eventually tested. At a bench conference shortly thereafter, however, defense counsel alerted the judge to Carr's oblique reference to later testing of a firearm. Counsel specifically expressed concern about the possible admission of additional testimony concerning this weapon. The prosecutor said she thought the examiner knew he was not to discuss the subject further, but the judge took a break to allow the prosecutor to warn Carr explicitly.

At trial, the party guests gave somewhat conflicting accounts of the events leading to Irvin's death.

Brandie testified that Irvin had arguments with different people that day, including herself. At one point he said he would "snatch little niggas' guns and beat 'em with [them]." Brandie thought he had directed that comment at Robinson or Brownlee because they were smaller than he was. At one point, she testified, Irvin touched her inappropriately on her waist and buttocks, and she and he argued. Doran and Irvin also had an argument about the touching, which started inside the residence and then moved outside. According to Brandie, Brownlee convinced her to calm down and let the incident pass. Doran came back inside and went upstairs to the restroom. Irvin took off his shirt as though he was going to fight and went upstairs to find Doran. Brandie, Doran, and Irvin came back down the stairs. Then, according to Brandie, Thompson went outside first and shot his gun three times. Doran pushed Brownlee out the door. Doran and Irvin were

9

arguing, and Brownlee was trying to calm them down. Brandie saw Irvin with a gun; Doran put his hand on top of the gun; and the two men were talking. Doran told Brandie to go into the house, and she heard gunshots as she turned around. She then saw Irvin on the ground, and everyone began running. Brandie and her children got into a car with Nicki and drove away.

After dropping off the children, Brandie snorted cocaine and drove around until Doran called to be picked up. Doran told her that Brownlee had killed Irvin or told her to say so. Brandie went back to the crime scene and gave her statement to the police. Brandie testified at trial that she was drunk and high on cocaine during her police interview. She also claimed the investigating detective, Bye, badgered her, said she would never see her kids again, and said "cut the crap, bitch, we know your brother did it." Bye denied calling Brandie a name and said he did not try to intimidate her. He also testified that she did not appear to be under the influence of alcohol or drugs when she gave her statement.

Shaella testified that Brownlee did not have a problem with anyone downstairs at the party. He was the only man present who was calm and sober. Irvin and Brandie exchanged words for 15 minutes about him touching her, but Brownlee calmed them. Doran went upstairs, and Irvin followed him, saying that Brandie and Brownlee were talking about him. Doran asked Irvin to leave, and Irvin told Doran, "I'll smack you and your bitch." Brownlee again told everyone to calm down, but Doran and Irvin began arguing and went outside.

Shaella said that Brinson shot at the ground three times and said, "[Y]'all gonna calm down or I'm—I'm gonna start acting crazy." She also heard Irvin speak to Brownlee and heard Brownlee say he was not going to fight. Brandie went outside to tell Brownlee to stay out of the argument. Then Doran pushed Brandie back into the house. When she

10

first heard shots, Shaella ran upstairs. When the gunfire stopped, she went back downstairs and looked outside. She saw Brownlee and Irvin "rassling." Doran was trying to break them up. Brinson and Thompson were standing nearby each holding a gun. She then heard more shots and ran back upstairs with Brinson behind her. Brinson was holding a gun and said she needed to get out of the house if she did not "wanna die." Shaella ran out the front door with Brandie and the children and got into a car with a friend and Erin.

Eventually the people in the car with Shaella picked up Brandie and Doran, who had a "secret" conversation in the car. Shaella testified the group dropped Doran off near his house and later took Brandie back there as well. Police later spoke to Shaella, and she said that only Brownlee and Irvin were arguing. When confronted with this statement at trial, Shaella acknowledged that she provided more limited information to police than she did at trial and said she had been afraid to do otherwise.

Erin testified that she spent time both upstairs and downstairs at the party at Doran's house. She observed Irvin "in [Brownlee]'s face" and said they were talking about a fight. In her police statement, Erin had said Brownlee was spitting on Irvin. Irvin said, "Bro, can you see or something," and Brownlee responded, "I'm not your bro or your cuz." Everybody was arguing, and she heard Irvin say that his "daddy taught him to take people's guns and beat them up or something." Erin said she was upstairs with the children when she heard "a lot of yelling." Everything appeared to cool down; then she heard gunshots. Brinson came upstairs with a gun and told everyone to get out of the house.

Doran testified that Irvin touched Brandie and another female inappropriately. He talked to Irvin about it but said he was not really mad. He denied shooting Irvin. Doran said that Brownlee was carrying a gun in the side of his pants. Brownlee and Irvin had an

11

argument, and Irvin said something about cowards having guns. Doran tried to get between the men but was pushed or pulled away and then heard gunshots. He reluctantly admitted that Brownlee shot Irvin, which was consistent with his earlier statement to police.

Jackson did not want to testify at trial and was uncooperative. He admitted to having a gun on the night of Irvin's death but said he did not fire his gun. He could not testify with certainty about who shot Irvin. However, in his police statement, Jackson had said he saw Brownlee "walk back up to [Irvin] and finish[] unloading a gun into his body."

Brinson testified that Doran, Brownlee, and Irvin were outside but that he could not see them when he heard gunshots. He ran upstairs to warn the children to get out of the house. He denied having a gun with him.

Thompson testified that he heard a loud commotion and saw Irvin and Brownlee go outside. A few minutes later he heard 10 to 12 gunshots. He saw Doran and Brandie run outside. He looked outside to see what was going on and saw Brownlee shooting Irvin. He went back inside to make sure everyone else got out safely. Thompson denied having or firing a gun. His statement to the police was similar to his trial testimony.

During the jury instruction conference, Brownlee initially asked the district judge to instruct only on first-degree premeditated murder, *i.e.*, not to give any lesser included offense instructions on the more serious charge. The district judge suggested that the evidence also supported a second-degree murder instruction. At that point, defense counsel argued that a voluntary manslaughter instruction should be given because some evidence established a quarrel between Brownlee and Irvin. The State disagreed, arguing the evidence did not establish adequate provocation as a matter of law. Ultimately the

12

judge declined to give a voluntary manslaughter instruction, concluding the evidence was insufficient to show heat of passion or a sudden quarrel.

The jury was given the following definition of premeditation from PIK Crim. 4th 54.150(d): "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." During closing argument, the prosecutor made the following comments concerning premeditation:

"So let's start with the premeditation, okay. That is defined as the defendant must have formed the design or intent to kill before the act. There is no specific time period required. Obviously when we think of the textbook premeditation, we're thinking of someone who's like writing a journal about how they're going to kill people maybe days, maybe months before. And that's true, that is premeditation. However, Kansas law does not require that that be the case. What it requires is that the decision is not instantaneous, meaning the law requires that he has to have some time to think to himself and plan I'm going to kill Tony Irvin. And that can happen within a day, it can happen within a few hours, it can happen within minutes, just not instantaneously.

"So I've made a list of the things that I have found in the evidence that support premeditation. The first is going to be the testimony of the coroner. Mr. Tony Irvin . . . isn't here, but his body still tells us some things about what happened to him that day that no witnesses can dispute in this case. *He was shot nine times, okay. And I don't ask you to consider each one by itself but all of these collectively. He was shot nine times. He was shot six times fatally, most of these are in very vital areas of the body. As Mr. Carr told us, this gun's not firing itself, it requires a process, it requires loading, it requires aiming, it requires pulling the trigger over and over again. That's some period of time there to cause those things.*

13

"*We also have defensive wounds on the victim on the right arm. He's holding up his right arm. If you're aiming and firing at someone and you see them holding up their arm or trying to move away, that gives you time to reflect. That's not happening in just an instant.*

"There's two distinct series of shots. Where am I getting that from? Well, we have Shaella Brownlee for one who tells us that, *we also had John Doran that mentioned it wasn't all one group. So there is at least some time period where shots stopped and started again. Again, that wasn't just an instant. That—during that time period this defendant could have reflected [on] what he was doing to Mr. Irvin.*

"We also have that this defendant, Mr. Brownlee, went outside after [Irvin] went outside. He did not have to go outside, he didn't have to take a gun outside, but he chose to do that. That's a moment where he could have reflected upon what he was about to do to Mr. Irvin.

"We have testimony from Shaella again and John Doran that this—that both John Doran and Brandie Brownlee were trying to calm Mr. Brownlee down. We have testimony from Brandie Brownlee herself, she says they were trying to calm him down, tell him it's not worth it, pulled him back. That was an opportunity he had for him to reflect on what he wanted to do to Mr. Irvin.

"We have testimony from Brandie Brownlee that this defendant fired a warning shot into the ground. He could have fired that shot and said, Tony . . . , I'm tired of you, I'm tired of you touching my sister, I'm tired of you being loud, whatever the problem was, get going, but he didn't. Instead he chose to fire more shots. That goes to premeditation.

"*We also have testimony from Brandie Brownlee that Mr. Gustin Brownlee fired at Tony after he had fallen to the ground. Once someone falls to the ground and you continue firing at them, that's an opportunity to reflect and form the intent to kill, plan on killing that person who in this case was Mr. Tony Irvin.*

"We also had the fact that this defendant fled following the incident. You can consider that as to whether or not he intended to kill Tony Irvin. He fled, he wasn't found until May 23rd.

"And finally for premeditation on my list is that Tony Irvin did not provoke this defendant. He might have been loud, yes. Maybe he was disrespectful to his sister, but he didn't pull a weapon on him. There's no testimony that [Irvin] had a weapon at all. He didn't get in his face or make any threats by anyone's testimony that night, any threats of violence. Maybe he was obnoxious, that's not provocation. And you do not have an instruction on self-defense and that's why, because under the law, self defense is not a defense in this case so it does not need to be considered.

"But those are the factors I suggest to you that support premeditation. And as a group, I think you can probably think of more too." (Emphases added.)

After the jury returned guilty verdicts on the two charges, when the district judge was considering the defense motion for mistrial based on Bye's testimony, defense counsel asked if the court's ruling would be affected if Carr's testimony were considered as well. The judge observed that no objection or motion for mistrial had previously been based on Carr's testimony but ruled that even any cumulative prejudice from Bye's and Carr's improper testimony would not require a mistrial to be declared.

The defense later filed a motion for new trial, raising several issues. Relevant to this appeal, Brownlee again challenged the testimony from Bye and Carr. At the hearing on the matter, the defense argued that Bye's statement "leads the jury to believe [Brownlee] has a propensity for carrying guns and things of that nature when, as the court knows, our defense was that he was unarmed on the evening of the murder." On Carr's testimony, counsel argued that it could be inferred there was a weapon found when that was not accurate. The judge agreed with defense counsel's decision not to seek an admonishment of the jury after Bye's improper testimony. But the judge concluded that,

although both witnesses injected error into the trial, neither incident was prejudicial enough under the state statutory harmless error standard, see K.S.A. 2014 Supp. 60-261, to warrant a new trial.

Brownlee also continued to argue posttrial that his speedy trial right had been violated, but neither party discussed the existence of a parole hold at the hearing on the motion for new trial. The judge again rejected Brownlee's speedy trial argument.

Brownlee was sentenced to a hard 25 life sentence on the murder conviction, consecutive to 8 months' imprisonment for the conviction of criminal possession of a firearm.

After Brownlee's appeal was docketed in this court, the State added a May 17, 2012, warrant for Brownlee's arrest issued by the Kansas Department of Corrections to the record on appeal. The parties have agreed that this document was not part of the record before the district court. The warrant states that Brownlee should be taken into custody and arrangements should be made for him to return to the designated institution to await a further hearing before the Kansas Parole Board. An accompanying report alleges that Brownlee violated the terms of his postrelease supervision based on the charges in this case and by failing to report travel and residence on May 16, 2012. Brownlee was not actually transported to the Hutchinson Correctional Facility for a hearing on his alleged postrelease supervision violations until June 19, 2013.

STATUTORY SPEEDY TRIAL

Brownlee first argues on this appeal that his statutory right to a speedy trial was violated, warranting vacation of his convictions and dismissal of the case with prejudice.

16

He does not argue that any federal or state constitutional right to speedy trial was violated.

At the time Irvin was killed, K.S.A. 22-3402(1) provided in relevant part:

"If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within 90 days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (5)."

The statutory speedy trial clock starts running at arraignment. *State v. Sievers*, 299 Kan. 305, 307, 323 P.3d 170 (2014). For Brownlee, waiver of formal arraignment took place on September 12, 2012. "Only the State is authorized to bring a criminal prosecution to trial, so it is the State's obligation to ensure that a defendant is provided a speedy trial within the statutory limits." 299 Kan. 305, Syl. ¶ 2. Although Brownlee filed two motions asserting his right to a speedy trial, a defendant is not required to take any affirmative action to see that his or her right to a speedy trial is vindicated. 299 Kan. at 307-08.

*Applicability of 90-day Time Limit*

We first must dispense with the State's assertion that the K.S.A. 22-3402(1) speedy trial limit of 90 days did not apply to Brownlee because he was not being held solely by reason of the charges pending in this case. See *State v. Montes-Mata*, 292 Kan. 367, Syl. ¶ 2, 253 P.3d 354 (2011) ("A defendant who is not being held 'solely by reason' of the pending charges is not entitled to the protections of the 90-day time limit for bringing a defendant to trial under K.S.A. 22-3402."). The State concedes that this argument was not raised before the district court and that the supporting warrant and

17

accompanying report were not part of the district court record. Because of this unusual circumstance, this court sought briefs from the parties on whether the documents could be added to the record on appeal or otherwise considered.

The State first asserts that the district judge was on notice of Brownlee's parole hold because the journal entry in this case orders Brownlee's sentence to run consecutive to his sentence in the case giving rise to the hold. We reject this argument. The journal entry was not in existence during the time Brownlee's speedy trial right was being ruled upon in district court, and the district judge never indicated any awareness of a parole hold when calculating time and setting the trial date. In fact, when defense counsel was asked if there was another hold, the answer was no, and the State did not interject. In addition, there is nothing about the journal entry that demonstrates the existence or vitality of a hold, as opposed to mere recognition of an earlier sentence not fully served. See *Montes-Mata*, 292 Kan. at 370-71 ("Unless a communication from another agency or jurisdiction constitutes a present custodial claim on a defendant, it cannot affect the speedy trial question of whether the defendant is being held solely on pending charges.").

The State next argues that Supreme Court Rules 3.01 and 3.02 (2014 Kan. Ct. R. Annot. 20) provide authority for adding the warrant and report to the record on appeal. Rule 3.01(b)(2) provides that "[a]n appellate court may, on its own, order that additional parts of *the entire record* be filed." (Emphasis added.) (2014 Kan. Ct. R. Annot. 20). Rule 3.02(d) provides that "[a] party may request adding to the record on appeal any part of *the entire record* under Rule 3.01(a)." (Emphasis added.) (2014 Kan. Ct. R. Annot. 21). Rule 3.01(a) (1 through 4) define the "entire record" as all original papers and exhibits filed in the district court, the court reporter's notes and transcripts of proceedings, any other court-authorized record of the proceedings, and the entries on the appearance docket. (2014 Kan. Ct. R. Annot. 20). The warrant and report were not among the original papers

18

filed in the district court and thus do not qualify as part of "the entire record" under Rules 3.01 and 3.02. These authorities do not assist the State.

The State also contends that this court is permitted to take judicial notice of the warrant and report under K.S.A. 60-409(b)(4), which provides: "(b) Judicial notice may be taken without request by a party, of . . . (4) specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." The State argues that parole holds issued by the Department of Corrections are amenable to immediate and accurate determination through "a quick online search and/or phone call to a state government agency."

Brownlee responds that these documents are not amenable to "immediate . . . determination by resort" to an easily accessible source and that any source is not indisputably accurate. K.S.A. 60-409(b)(4). Rather, he asserts, the State would have had to follow certain procedures to admit the documents into evidence before the district court. See K.S.A. 2014 Supp. 60-460(o) (hearsay exception that allows for the admission of official records subject to authentication); see also K.S.A. 60-465 (exceptions for requiring evidence of authenticity of copies of records if (1) office in state, documents attested to as correct copies, (2) office in United States, documents attested to, authenticated by seal). In addition, Brownlee asserts that mistakes can be and are made in such documents. See, *e.g*., *In re K.B.J.*, No. 102,922, 2010 WL 348294, *2 (Kan. App.) (unpublished opinion), *rev. denied* 290 Kan. 1094 (2010) (district court erred in taking judicial notice of criminal history under K.S.A. 60-409; Department of Correction's online system includes a disclaimer of accuracy of information); see also http://www.dc.state.ks.us/kasper.

19

Brownlee also relies on two other cases in support of his argument rebuttal to the State's argument urging judicial notice. In *State v. Taylor*, 198 Kan. 290, 299, 424 P.2d 612 (1967), this court held uncertified machine copies of Federal Bureau of Investigation and KBI "'rap sheets'" to be hearsay evidence, absent from the list in Kansas statutes on judicial notice, and not to contain "'facts of generalized knowledge capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy' (K.S.A. 60-409[a] and [b])." Brownlee also directs us to *Leffel v. Kansas Dept. of Revenue*, 36 Kan. App. 2d 244, 249, 138 P.3d 784 (2006), in which a Court of Appeals panel resisted taking judicial notice of Kansas Department of Health and Environment internal documents not readily accessible in published form.

We are not persuaded by the State's arguments and authorities on the facts and record in this case. As the documents the State seeks to have us consider are not properly before us, they cannot be relied upon to demonstrate that Brownlee was in custody pending trial for reasons other than the first-degree murder and criminal possession charges against him. The 90-day time limit of K.S.A. 22-3402 was applicable to Brownlee.

*Merits of Statutory Speedy Trial Claim*

The issue of whether the State violated a criminal defendant's statutory right to speedy trial raises a question of law subject to de novo review on appeal. *Sievers*, 299 Kan. at 307.

The 90 days from Brownlee's waiver of formal arraignment on September 12 expired on December 11, 2012. But any "delays that result from the request of a defendant toll the statutory speedy trial period." *State v. Vaughn*, 288 Kan. 140, 144, 200 P.3d 446 (2009). The statutory speedy trial right is waived if a defendant requests a

continuance or files a motion that delays trial beyond the statutory deadline. 288 Kan. at 144. And defense counsel's actions that delay trial are attributable to the defendant unless the defendant timely voices his or her disagreement with counsel's actions. 288 Kan. at 144.

> "For acquiescence to result in a waiver of speedy trial rights, the State must demonstrate more than mere passive acceptance and must produce some evidence of agreement to the delay by the defendant or defense counsel. The record must support a conclusion that the defendant expressly or impliedly agreed to the delay." 288 Kan. at 145.

Brownlee argues his statutory speedy trial right was violated because the defense was erroneously assessed the time between September 28 and October 26, 2012. On the way to this mistake, Brownlee asserts, his constitutional and statutory right to be present was infringed on September 28, and he thus was not given an opportunity to object in person to the critical continuance. Brownlee emphasizes that he had filed a pro se motion to protect his right to a speedy trial in July, *i.e.*, even before his waiver of formal arraignment and the September 28 hearing; that he had advised defense counsel and the district court that the prospects of securing retained counsel were uncertain; and that he had instructed counsel to schedule the trial at the September 28 hearing.

K.S.A. 2014 Supp. 22-3208(7) provides that a Kansas criminal defendant has a right to be present at a hearing on any motion. See *State v. Turner*, No. 107,412, 2013 WL 4404176, at *2 (Kan. App. 2013) (unpublished opinion), *review denied* 299 Kan. __ (2014). In addition, "K.S.A.1998 Supp. 22-3405, as well as the Sixth Amendment's Confrontation Clause and the Due Process Clause of the Fourteenth Amendment, require the defendant's presence at every critical stage of a trial. [Citations omitted.]" *State v. Bell,* 266 Kan. 896, 919-20, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999); see also *Howard v. State,* No. 106,782, 2012 WL 6217193, at *6 (Kan. App. 2012) (unpublished opinion) (panel assumed motion hearing critical stage; State did not contest error); *State*

21

*v. Taylor*, No. 104,455, 2011 WL 3795481, at *4 (Kan. App. 2011) (unpublished opinion) (defendant's absence prevented defendant from objecting to counsel's continuance).

Here, the State concedes that K.S.A. 2014 Supp. 22-3208(7) granted Brownlee a statutory right to attend the September 28 hearing. Given this concession, and our agreement that it is sound and sensible, we need not reach the further question of whether every motion hearing qualifies as a critical stage of trial under other statutory or constitutional provisions.

The State likewise concedes that Brownlee did not acquiesce in the continuance and says he should not be bound by the actions of his counsel in requesting it. See *Vaughn*, 288 Kan. at 144 (actions of defense counsel attributable to defendant unless defendant timely voices disagreement); *State v. Hines*, 269 Kan. 698, 703-04, 7 P.3d 1237 (2000) (when defendant objects to continuance beyond statutory limit, time cannot be assessed against defendant); *State v. Arrocha*, 30 Kan. App. 2d 120, 127, 39 P.3d 101 (2002) (if defendant stands silent, neither advocating nor acquiescing in delay, State must beware). This also qualifies as a sound and sensible concession, and we hold that the district judge erred in assessing the time between September 28 and October 26 against the defense. Brownlee should have been present to voice his opinion on September 28; without his presence, we are left with his earlier motion making clear he had wanted his trial set within the statutory speedy trial period.

*Reversibility*

Having conceded statutory speedy trial error, the State nevertheless argues that the error does not require reversal. It relies on a 2012 amendment to the speedy trial statute.

The meaning and applicability of a statutory amendment involve only questions of law arising on proved or admitted facts that will be finally determinative of the issue. See *State v. Barnes*, 293 Kan. 240, 255, 262 P.3d 297 (2011). We therefore address the issue on appeal, despite the lack of opportunity for the district judge to consider it.

Our standard of review is often repeated and familiar:

> "The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. Where there is no ambiguity, the court need not resort to statutory construction." *State v. Jolly*, 301 Kan. 313, Syl. ¶ 2, 342 P.3d 935 (2015).

The speedy trial statute was amended effective July 1, 2012, 64 days after Irvin's killing, to provide in relevant part:

> "(g) If a defendant, or defendant's attorney in consultation with the defendant, requests a delay and such delay is granted, the delay shall be charged to the defendant regardless of the reasons for making the request, unless there is prosecutorial misconduct related to such delay. *If a delay is initially attributed to the defendant, but is subsequently charged to the state for any reason, such delay shall not be considered against the state under subsections (a), (b) or (c) and shall not be used as a ground for dismissing a case or for reversing a conviction unless not considering such delay would result in a violation of the constitutional right to a speedy trial or there is prosecutorial misconduct related to such delay.*" (Emphasis added.) K.S.A. 2012 Supp. 22-3402.

The State acknowledges that a statute operates prospectively unless there is clear language indicating the legislature intended otherwise. *State v. Waller*, 299 Kan. 707, 718, 328 P.3d 1111 (2014). But it argues for application of an exception to this rule

23

because, in its view, this statutory change did not prejudicially affect Brownlee's substantive rights and is merely procedural or remedial in nature. See *State v. Williams*, 291 Kan. 554, 557, 244 P.3d 667 (2010); see also *State v. Hutchison*, 228 Kan. 279, 287, 615 P.2d 138 (1980) (procedural amendment provides, regulates steps by which punishment for criminal act meted out; substantive amendment declares specific acts crimes, prescribes punishment).

The statute does not expressly state whether subsection (g) applies retroactively, and we discern no clear legislative intent on this point in other sources. See *State v. Jaben*, 294 Kan. 607, 613, 277 P.3d 417 (2012). Our research reveals no cases interpreting this amendment or exploring its retroactivity. And recorded legislative history provides no guidance.

Lacking these indicators, we observe that the provision does not alter the law on the acts that qualify as crimes. Nor does it alter the punishment for any crime. It does, on the other hand, regulate the steps of the judicial process. We therefore conclude that K.S.A. 2012 Supp. 22-3402(g) is a procedural provision, and it can be retroactively applied to Brownlee's case. See *Williams*, 291 Kan. at 557.

On the subject of where retroactive application then leads, the State focuses on the second sentence of subsection (g) emphasized above. The State contends that the district judge's error in assessing the time between September 28 and October 26 against the defense did not violate Brownlee's constitutional right to a speedy trial or flow from prosecutorial misconduct. Thus, in the State's view, we must disregard the mere statutory violation that resulted from exceeding subsection (a)'s 90-day time limit.

Brownlee counters that the first sentence of subsection (g) sets up a precondition for application of the second sentence to save a conviction on appeal. The first sentence assesses time attributable to delay sought by defense counsel to the defense only if the delay was sought "in consultation with the defendant" and only as long as there was no

24

related prosecutorial misconduct. Because Brownlee explicitly told his lawyer not to continue the trial setting, he reasons, neither the first sentence nor the second sentence of subsection (g) can be invoked by the State to affirm his convictions.

We disagree with Brownlee's interpretation of what we believe is the plain language of the statute. The two sentences of the subsection are not worded to make them contingent upon each other. The first sentence clearly applies to situations, unlike this case, where the defendant himself, or upon consultation with his attorney, requests a delay that is granted. In such a factual scenario, the defense is charged with the delay for speedy trial purposes, barring related prosecutorial misconduct. The second sentence is much broader in its application. It involves situations where "*a* delay is initially attributed to the defendant[] but is subsequently charged to the state for *any reason* . . . ." (Emphases added.) K.S.A. 2012 Supp. 22-3402(g). The second sentence covers the factual scenarios encompassed by the first sentence, *i.e.*, those in which the defendant alone or in consultation with counsel requested a delay. But it is not limited to such situations. Absent prosecutorial misconduct or a violation of a defendant's constitutional speedy trial right, the second sentence also is applicable to any factual situation in which a delay initially charged to the defense is subsequently charged to the State.

The facts of this case fall squarely within the circumstances described by the second sentence of subsection (g). The district judge erroneously assessed the time between September 28 and October 26, 2012. We have now concluded the time should have been charged to the State. Brownlee does not assert on appeal that his constitutional right to a speedy trial was violated, and he says only that he "may" claim that prosecutorial misconduct had a role in the delay because the State did not secure his presence without alleging or demonstrating that he or his counsel ever sought to have him brought to court. The only speedy trial violation before us is purely statutory, arising out of application of what was then subsection (1)'s and is now subsection (a)'s 90-day limit. Under subsection (g), the legislature, which created the statutory right, has decided to

25

eliminate the remedy for its violation in certain circumstances, providing explicitly that the violation "shall not be used as a ground for dismissing a case or for reversing [Brownlee's] conviction." K.S.A. 2012 Supp. 22-3402(g). We are compelled by this plain language to affirm the district judge's refusal to dismiss this case on statutory speedy trial grounds. In essence, the judge managed to arrive at the right destination via the wrong road. *State v. Bryant*, 272 Kan. 1204, 1210, 38 P.3d 661 (2002).

VOLUNTARY MANSLAUGHTER INSTRUCTION

Brownlee next argues that the district judge erred by failing to instruct the jury on voluntary manslaughter.

"For jury instruction issues, the progression of analysis and [the] corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward,* 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

On reviewability, this court has observed that "[t]o fully preserve a claim that the district court erred in failing to give a lesser included offense instruction, the defendant must distinctly state an objection to the omission before the jury retires to consider its verdict. K.S.A. 22-3414(3)." *State v. Wade,* 295 Kan. 916, 924, 287 P.3d 237 (2012). This obligation to object was fulfilled in this case.

26

On the second question of whether a voluntary manslaughter instruction was legally appropriate, we recognize that voluntary manslaughter—the knowing killing of a human being committed upon a sudden quarrel or in the heat of passion, K.S.A. 2014 Supp. 21-5404(a)—is a lesser included offense of first-degree premeditated murder. See *State v. Hayes*, 299 Kan. 861, 864, 327 P.3d 414 (2014); *State v. Gooding*, 50 Kan. App. 2d 964, 979-80, 335 P.3d 698 (2014), *rev. denied* 301 Kan. ___ (2015) (voluntary manslaughter lesser included offense of murder as lesser degree of same crime). An instruction on the elements of voluntary manslaughter was legally appropriate in this case. See *State v. Story*, 300 Kan. 702, 710, 334 P.3d 297 (2014).

We next turn to whether a voluntary manslaughter instruction was factually appropriate. In order to require the instruction, there must have been evidence that would reasonably justify a conviction of the lesser included crime. 300 Kan. at 710. This court does not speculate about hypothetical scenarios. 300 Kan. at 710 (quoting *Wade*, 295 Kan. at 925).

> "The key elements of voluntary manslaughter under K.S.A. 21-3403 are an intentional killing and legally sufficient provocation. [Citation omitted.] When reviewing whether provocation was legally sufficient, an objective test is used. [Citation omitted.] 'Heat of passion' has been defined as 'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror,' based 'on impulse without reflection.' [Citation omitted.] The provocation '"must be sufficient to cause an ordinary man to lose control of his actions and his reason."' [Citations omitted.]

> . . . .

> "[I]n order to reduce a homicide from murder to voluntary manslaughter, there must be an adequate provocation that deprives a reasonable person of self-control and

27

causes that person to act out of passion rather than reason. Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter." *Hayes*, 299 Kan. at 864-66.

A sudden quarrel can be one form of heat of passion. *State v. Johnson*, 290 Kan. 1038, 1048, 236 P.3d 517 (2010). "[A]n unforeseen angry altercation, dispute, taunt, or accusation could fall within th[e] definition [of heat of passion] as sufficient provocation." 290 Kan. at 1048. "'The hallmark of heat of passion is taking action upon impulse without reflection.'" *State v. Hilt*, 299 Kan. 176, 194, 322 P.3d 367 (2014) (quoting *Wade*, 295 Kan. at 925).

Brownlee argues that numerous witnesses testified the shooting was part of an angry dispute or altercation. He points to evidence that Irvin inappropriately touched Brownlee's sister, Brandie, and, when confronted, said "I'll smack you [Doran] and your bitch [Brandie]." When Doran, Irvin, Brinson, Thompson, and Brownlee went outside, one man shot at the ground saying, "[Y]'all gonna calm down or I'm . . . gonna start acting crazy." Brandie said she tried to go outside to calm Brownlee down, and Doran testified that Irvin and Brownlee argued outside the house. Shaella testified that she saw Irvin and Brownlee "rassling" and that Doran was trying to break the fight up. Brownlee asserts that this evidence supported an "objectively sufficient provocation for an emotional state of mind of 'rage, anger, hatred, [or] furious resentment.'" See *State v. Horn*, 278 Kan. 24, 40-42, 91 P.3d 517 (2004).

The State responds that even when the evidence is viewed in the light most favorable to the defense, it does not support legal, sufficient provocation. It points out that Brandie and Shaella testified that Brownlee was calm; that both Doran and Brandie tried to prevent Brownlee from confronting Irvin; that Irvin was provoking Brandie, not Brownlee; and that Irvin did not have a weapon or threaten Brownlee. See, *e.g.*, *State v. Stallings*, 246 Kan. 642, 649, 792 P.2d 1013 (1990) (testimony that defendant, victim

argued insufficient to warrant voluntary manslaughter instruction; no evidence of aggressive acts, physical threats, physical assault with insulting language by victim). The State also points out that a sudden quarrel between a victim and a third party will not support a conviction of voluntary manslaughter. See *State v. Clark*, 263 Kan. 370, 374, 949 P.2d 1099 (1997) (sudden quarrel voluntary manslaughter instruction inappropriate when defendant shot victim fighting with third person); *State v. Harris*, 27 Kan. App. 2d 41, 44, 998 P.2d 524 (2000) (sudden quarrel voluntary manslaughter inappropriate when party guest, not defendant, said he wanted victim dead).

Viewing the evidence in the light most favorable to the defense, Irvin had inappropriately touched Brandie, and they argued. At some point Irvin said he would "smack" both Doran and Brandie. But this behavior and comment were not directed at Brownlee. The only insulting or threatening language Irvin may have used toward Brownlee at some point during the night were his comments that he would "snatch little niggas' guns and beat 'em with it" and that he would be back later to hurt Brownlee. Irvin was unarmed, but Brownlee was carrying a gun. Irvin and Brownlee argued outside the house, and one witness testified that they were "rassling" before the shots were fired. But no evidence was presented about who started the physical fight or what the two men were arguing or fighting about. The dispute was not sudden; it merely simmered. Such evidence does not rise to the level of "adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason." *Hayes*, 299 Kan. at 866.

Because a lesser included instruction on voluntary manslaughter would not have been factually appropriate in this case, the district judge did not err in refusing to give it. We need not reach the further question of whether any error was harmless.

Brownlee argues the prosecutor committed misconduct during closing argument by stating that a defendant can form premeditated intent to kill during the act of shooting a gun. Brownlee points to statements that Irvin was shot several times; that the shooting involved a process of loading, aiming, and pulling the trigger over a period of time; that Brownlee had time to reflect when Irvin took a defensive posture, which could not have happened in an instant; and that there were two distinct series of shots. The State's response is that even a cursory review of the record disproves Brownlee's mischaracterization of the prosecutor's comments.

We note first that no contemporaneous objection was necessary to preserve this issue for appeal. *State v. Crawford*, 300 Kan. 740, 744, 334 P.3d 311 (2014). We next must determine whether the prosecutor's comments were improper. "[W]hile a prosecutor has wide latitude in discussing evidence, the remarks must accurately reflect that evidence, accurately state the law, and cannot be intended to inflame the passions or prejudices of the jury or divert the jury from its duty to decide the case based on the evidence and controlling law." *State v. Marks*, 297 Kan. 131, 136, 298 P.3d 1102 (2013).

"'Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.'" *State v. Jones*, 298 Kan. 324, 336, 311 P.3d 1125 (2013) (quoting *State v. Martis*, 277 Kan. 267, 301, 83 P.3d 1216 [2004]). We have also recognized that "'[p]remeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct, but it does not have to be present before a fight, quarrel, or struggle begins.'" *State v. McBroom*, 299 Kan. 731, 756,

325 P.3d 1174 (2014) (quoting *State v. Gunby*, 282 Kan. 39, Syl. ¶ 9, 144 P.3d 647 [2006]).

This court considers the following factors to assist in determining whether evidence gives rise to an inference of premeditation:  "(a) the nature of the weapon used; (b) the lack of provocation; (c) the defendant's conduct before and after the killing; (d) the defendant's threats and declarations before and during the occurrence; and (e) the dealing of lethal blows after the deceased was felled and rendered helpless." *State v. Lloyd*, 299 Kan. 620, Syl. ¶ 5, 325 P.3d 1122 (2014). This determination is not driven by the number of factors present because one factor alone may constitute compelling evidence of premeditation. *Lloyd*, 299 Kan. 620, Syl. ¶ 5. "'"[P]remeditation and deliberation may be inferred from the established circumstances of a case, provided the inference is a reasonable one."'" *Jones*, 298 Kan. at 336.

Brownlee first contends the prosecutor's argument that premeditated intent could be developed simultaneous to the act of firing gunshots misstated the law, eliminating the line between mere intent and the actual forethought required for premeditation. "[T]his court has repeatedly warned prosecutors about going outside of the approved language in PIK Crim. 3d 56.04(b) and making comments that are analogous to stating premeditation can occur in the same instant as the act that results in a death." *State v. Kettler*, 299 Kan. 448, 474-75, 325 P.3d 1075 (2014) (prosecutor misstated law of premeditation by saying "'[Y]ou could think it over, just a half second before you actually fired the fatal shot.'").

Among the caselaw precedents cited by the parties is *State v. Anthony*, 282 Kan. 201, 145 P.3d 1 (2006). In that case, the victim was beaten with an object, and the prosecutor stated in closing argument:

> "'[I]f you think about it, the two blows that actually killed [the victim] had to occur at
> some point, they may have occurred last and [the victim] went to the ground, but if they
> came last, then there is [*sic*] at least five blows before them. This person is thinking about

31

what they are doing. They know what they are doing. If those two blows came first, then [the victim] is unconscious, defenseless on the ground, and this person continues to beat him at least five more times. That's premeditation.'" 282 Kan. at 208.

We ruled there was no misconduct in this description of the number and possible order of the blows and of the potential for the defendant to think about what he was doing before inflicting additional blows on a victim already rendered helpless. 282 Kan. at 209.

Our decision 2 years later in *State v. Warledo,* 286 Kan. 927, 190 P.3d 937 (2008), is similar. In that case, the defendant had stomped the victim 15 times as she lay on the floor, and the prosecutor argued premeditation could be formed in between stomps and again as the defendant walked away and returned. This court held that multiple blows may afford a defendant an opportunity to think, that the infliction of additional blows once a victim is already helpless can show premeditation, and that the prosecutor's comments on these subjects merely informed the jury that the defendant could have developed the plan to commit murder once his fight with the victim began. This theory was supported not only by the number of stomps but by a 911 tape recording in which the defendant could be heard telling the victim she would die. 286 Kan. at 950.

In *State v. Hall,* 292 Kan. 841, 257 P.3d 272 (2011), the victim was shot once and then three more times in more rapid succession. The prosecutor argued that the defendant could have formed premeditation after the first trigger pull. We ruled the prosecutor committed misconduct by arguing that premeditation could be formed after the first trigger pull because all of the shots were still so closely spaced that the argument erroneously suggested that premeditation could be formed instantaneously. 292 Kan. at 852.

In *Marks*, the defendant challenged the prosecutor's statement that premeditation could be formed "'during the act itself'" when the victim was stabbed eight times. 297 Kan. at 137. We observed that the stabbing made the case more similar to *Warledo* and

32

*Anthony* than to *Hall* because the act of stabbing someone eight times is not instantaneous like rapid gunfire can be. Nevertheless, the prosecutor's statement that premeditation could occur "'during the act itself'" meant "the prosecutor confused the formation of premeditation from what was instructed given the particular fact pattern in this case and the conflict in the evidence." 297 Kan. at 139. This meant there was error, but it was not reversible. 297 Kan. at 139-41.

This court has considered the fact that a victim was shot 11 times in rapid succession to evidence premeditation. See *State v. Qualls*, 297 Kan. 61, 68, 298 P.3d 311 (2013); see also *State v. Cosby*, 293 Kan. 121, 134, 262 P.3d 285 (2011) (evidence of premeditation in multiple shots fired at victim, including a pause between first and second shot). And in *Jones*, we decided that a prosecutor's discussion of the defendant's decision to put "'five-pound pressure'" on a trigger and discussion of the amount of time required to raise his arm and pull the trigger did not imply instantaneous premeditation. Rather, the prosecutor identified key factual intervals when the defendant had an opportunity to think about the killing and proceed or change course. 298 Kan. at 336-37.

Predictably, Brownlee relies on *Marks* and *Hall.* The State persuasively distinguishes this case from *Marks* because the prosecutor never stated or implied that "'intent can be formed during the act itself'" and did not imply that premeditation could be instantaneous. See 297 Kan. at 137. The State also distinguishes this case from *Hall,* in which all of the shots were fired in rapid succession. In that case, we explicitly left for another day consideration of the State's assertion that it was "'theoretically possible'" to fire one shot instantaneously and without premeditation and then to premeditate before firing additional shots. *Hall*, 292 Kan. at 852.

In this case, the prosecutor's comments were within the bounds of the law because they described the totality of the evidence regarding premeditation, *i.e.*, the use of a deadly weapon, the dealing of lethal blows after the victim had been rendered helpless,

additional conduct before and after the killing, and the lack of provocation. *Lloyd*, 299 Kan. 620, Syl. ¶ 5. After properly stating the definition of premeditation, the prosecutor pointed out key factual intervals supported by the evidence that established premeditation: (1) the number and location of Irvin's gunshot wounds; (2) the process and reflection necessary to fire a gun; (3) the defensive wounds on the body; (4) the two distinct series of shots with a pause between them; (5) Brownlee's failure to calm down and his decision to follow Irvin outside; (6) Brownlee's firing of warning shots into the ground before shooting Irvin; (7) Brownlee's decision to continue to fire after Irvin was on the ground; (8) Brownlee's action in fleeing the scene after the shooting; and (9) the lack of provocation. The prosecutor's comments were not outside the wide latitude allowed in discussing the evidence of premeditation or the law governing the jury's evaluation of it.

Brownlee also argues that *State v. Huddleston*, 298 Kan. 941, 953, 318 P.3d 140 (2014), supports his view that the prosecutor committed misconduct by saying: "Once someone falls to the ground and you continue firing at them, that's an opportunity to reflect and form the intent to kill, plan on killing that person . . . ." In *Huddleston*, the defendant killed the victim by injecting him with insulin, and prosecutors repeatedly mentioned events that occurred after the injection without stating that premeditation could be inferred from those events. We held that the suggestion that premeditation was going on after the homicidal act of giving the injection was a misstatement of the law because premeditation cannot occur "after a defendant commits an act that results in a death." 298 Kan. 941, Syl. ¶ 1.

Again, the State persuasively responds to Brownlee's argument. It asserts that there was no evidence here that Irvin was dead or even fatally wounded when he fell to the ground. The coroner testified that six of the nine shots were fatal, but he could not testify to the order in which the shots occurred. The coroner also testified it was hard to say, but Irvin probably was trying to use his right forearm to block the shot. He opined

that Irvin "probably" fell down when he was shot in the back of the head, which would cause instantaneous death, and then a bullet "might have" hit the front side of his body. In *Huddleston*, the injection of insulin was unquestionably the homicidal act.

This argument of Brownlee also lacks merit because "a prosecutor may properly point out that the number and order of blows could have given the defendant 'an opportunity to think about what he or she was doing' and that 'infliction of additional blows after the first blows' which rendered the victim helpless could evidence premeditation." *Warledo*, 286 Kan. at 950. In this case, in which evidence was presented of a pause between two sets of gunshots, of defensive wounds, and of shots fired while the victim was on the ground, the prosecutor was justified in discussing the additional shots fired after Irvin fell as evidence of premeditation.

Because we conclude that the prosecutor's challenged statements were not improper, it is unnecessary to consider harmlessness. See *State v. Hunt,* 285 Kan. 855, 866, 176 P.3d 183 (2008).

## MOTIONS FOR MISTRIAL AND NEW TRIAL

Brownlee next argues that the district judge erred by denying him a mistrial and/or new trial based on the improper statements from the detective and the firearm expert. Brownlee's objection to the detective's testimony was ruled on as a motion for mistrial during trial and as part of a motion for new trial between conviction and sentencing. As discussed above, no objection to the firearms expert's testimony was lodged at trial, but after Brownlee had been convicted, the defense asked the judge if the cumulative effect of both witnesses' testimony would have warranted a mistrial. Thus the firearms expert's testimony was ruled on at the motion for new trial hearing. Given these events below, we will address whether the detective's testimony warranted a mistrial or a new trial and whether the firearms expert's testimony, when considered in conjunction with the

detective's testimony, warranted a new trial. See *State v. Clay*, 300 Kan. 401, 412-15, 329 P.3d 484, *cert. denied* 135 S. Ct. 728 (2014) (mistrial, new trial standards of review applied to combination of alleged errors).

This court reviews a district court's decision denying a motion for mistrial under an abuse of discretion standard. We ask: "(1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice?" *State v. Waller*, 299 Kan. 707, 726, 328 P.3d 1111 (2014).

> "Under K.S.A. 22-3423(1)(c), a trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. This statute creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial." *Waller*, 299 Kan. 707, Syl. ¶ 3.

Decisions on motions for new trial also are reviewed for abuse of discretion. Under K.S.A. 2014 Supp. 22-3501, a district judge should grant a defendant's request for a new trial when doing so is in "the interest of justice." The district judge abuses his or her discretion when the decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Clay*, 300 Kan. at 414.

We turn first to the detective's testimony.

It is undisputed that the detective violated the court's order by stating that several people had seen Brownlee with a gun in the past. Our motion for mistrial analysis thus shifts immediately to whether it was possible to continue the trial without an injustice. *Waller*, 299 Kan. 707, Syl. ¶ 3.

> "Appellate courts reviewing . . . for an injustice may take a broader view than the trial court because appellate courts may examine the entire record. The degree of certainty required to conclude an injustice did not occur varies depending on whether the fundamental failure infringes on a constitutional right. To declare a nonconstitutional error harmless, the appellate court must apply K.S.A. 60-261 and K.S.A. 60-2105 to determine if there was a reasonable probability that the error affected the trial's outcome. And if the fundamental failure infringes on a right guaranteed by the United States Constitution, the appellate court applies the constitutional harmless error analysis defined in *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967)." *Waller*, 299 Kan. at 726.

Brownlee contends that the detective's testimony led the jury to believe that Brownlee had a propensity for carrying guns. He asserts that this was prejudicial and that the district judge did not protect his right to a fair trial. He summarily concludes that the State cannot meet its burden to show harmlessness under the constitutional standard.

The State, in response, directs our attention to "more egregious" cases that did not require reversal. In one of those cases, *State v. Ransom*, 288 Kan. 697, 207 P.3d 208 (2009), a detective violated a pretrial limine order preventing discussion of gang affiliation at trial. The district judge denied a motion for mistrial, reasoning that the question posed to the witness had not been designed to elicit the impermissible response and that the jury had been properly admonished to ignore the reference. On appeal, we

37

found no substantial prejudice; we characterized the comment as brief and innocuous and said it had been cured by an admonition. 288 Kan. at 714-15.

*State v. Tatum*, 281 Kan. 1098, 135 P.3d 1088 (2006), teaches a similar lesson. In it, the district judge denied a motion for mistrial when a detective testified that the defendant's name had come up during a prior homicide investigation and that the defendant had sold drugs in the past. We affirmed the district court, holding that the reference to the prior investigation was harmless because the defendant ultimately was not implicated in prior criminal activity, the evidence of his motive in the current case was abundant, and he had been identified as one of the shooters. 281 Kan. at 1111-12. We also ruled that the reference to previous drug sales was cured by an instruction, and we considered the existence of overwhelming evidence in holding that the defendant failed to establish substantial prejudice. 281 Kan. at 1113.

Here, the detective's improper testimony was fleeting, and it was unresponsive to the prosecutor's question. The district judge found neither the prosecutor nor the detective acted maliciously, and he agreed with defense counsel's decision not to seek an admonishment of the jury to avoid calling more attention to the problem. See *State v. Rinck*, 256 Kan. 848, 853-54, 888 P.2d 845 (1995) (no abuse of discretion in denying motion for mistrial when witness referred to defendant being in prison; statement singular, unsolicited; limiting instruction refused; statement could not have affected trial result); *State v. Hall*, 45 Kan. App. 2d 290, 310, 247 P.3d 1050 (2011) (district judge's refusal to draw more attention to brief, inadvertent, unsolicited testimony from detective by giving curative instruction considered; instruction would not have resulted in different verdict), *aff'd on other grounds* 297 Kan. 709, 304 P.3d 677 (2013).

We also note that in this case any prejudicial effect of the detective's improper testimony was diminished because several witnesses testified that Brownlee had a gun the night of the murder and that he shot Irvin several times. No reasonable probability exists

that the detective's testimony affected the trial's outcome; the district judge did not abuse his discretion in denying the motion for mistrial or the later motion for new trial on this ground. *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

With regard to the firearms expert, the parties also agree that the district judge's order was violated. The expert should have taken care not to imply that a firearm matching the casings found at the scene of the crime was eventually tested. So, again, our analysis shifts to whether Brownlee can establish substantial prejudice warranting a new trial in the interest of justice under K.S.A. 2014 Supp. 22-3501.

Brownlee provides minimal argument on this point, summarily contending that the expert's testimony was prejudicial and not harmless beyond a reasonable doubt.

The State, for its part, argues that the testimony was fleeting and innocuous. We also note that the district judge took a break so that the witness could be advised by the prosecutor that he should not mention the tested firearm again. He followed this instruction.

As with the detective's improper testimony, admonishing the jury about the comment would probably have done more harm than good, and overwhelming evidence supported Brownlee's convictions. Even when the erroneous testimony from both the detective and the firearm expert is considered together, Brownlee has failed to establish substantial prejudice warranting a new trial in the interest of justice under the statute. The district judge did not abuse his discretion in denying the motion for new trial on these grounds.

39

CUMULATIVE ERROR

Finally, Brownlee asserts the cumulative effect of several errors warrants reversal of his convictions.

"Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. Notably, cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant. Furthermore, a single error cannot constitute cumulative error." *Waller*, 299 Kan. 707, Syl. ¶ 4.

The only errors we have identified are a violation of Brownlee's statutory right to speedy trial, for which the legislature has eliminated a dedicated, individual remedy, and the detective's and firearm expert's inadmissible statements. Under the totality of the circumstances, these errors did not substantially prejudice Brownlee nor deny him a fair trial, particularly in light of the truly overwhelming evidence presented to support his convictions. Cumulative error does not necessitate reversal.

CONCLUSION

Defendant Gustin Brownlee has not persuaded this court that his convictions of first-degree premeditated murder and criminal possession of a firearm were infected by reversible error. The judgment of the district court is affirmed.

\* \* \*

LUCKERT, J., dissenting: I dissent from the majority's holding on two issues: I would hold that (1) Gustin Brownlee's speedy trial rights were violated and (2) the district court erred by failing to instruct the jury on the lesser included offense of voluntary manslaughter.

40

1. *The speedy trial violation demands reversal.*

The majority recognizes that Brownlee's trial did not begin within the speedy trial time limit of K.S.A. 2012 Supp. 22-3402 and that the district court erred by assessing time lost due to a continuance Brownlee did not personally request or approve. See K.S.A. 2012 Supp. 22-3402(g) ("If a defendant, or defendant's attorney in consultation with the defendant, requests a delay and such delay is granted, the delay shall be charged to the defendant . . . ."); *State v. Vaughn*, 288 Kan. 140, 144-45, 200 P.3d 446 (2009) (affirming that a waiver of speedy trial extends to defendant's request for or agreement to a continuance). Nevertheless, the majority holds the speedy trial violation does not warrant reversal of Brownlee's conviction because of the operation of K.S.A. 2012 Supp. 22-3402(g). I disagree with the majority's reading of that subsection and, more specifically, its disassociation of the first sentence from the second. I would hold that the entirety of subsection (g) relates to situations where "a defendant, or defendant's attorney in consultation with the defendant, requests a delay." See K.S.A. 2012 Supp. 22-3402(g).

The difference between my position and the majority's obviously comes down to a dispute about statutory interpretation. As the majority points out, when interpreting statutes, "the touchstone is legislative intent," if that intent can be ascertained. *State v. Brown*, 295 Kan. 181, 193, 284 P.3d 977 (2012). The most fundamental rule of statutory interpretation is that we attempt to discern that intent from the language used by the legislature. See *State v. Stallings*, 284 Kan. 741, 742-43, 163 P.3d 1232 (2007) (explaining this plain language inquiry). If we find that language ambiguous, we turn to canons of statutory construction or look to extrinsic aids such as legislative history or background considerations. *Brown*, 295 Kan. at 193; see also *State v. Raschke*, 289 Kan. 911, 914, 219 P.3d 481 (2009) ("Should a statute's meaning not be evident from its plain language, we move from interpretation to construction . . . .").

41

The legislature chose to use the following words when enacting K.S.A. 2012 Supp. 22-3402(g):

> "(g) If a defendant, or defendant's attorney in consultation with the defendant, requests a delay and such delay is granted, the delay shall be charged to the defendant regardless of the reasons for making the request, unless there is prosecutorial misconduct related to such delay. If a delay is initially attributed to the defendant, but is subsequently charged to the state for any reason, such delay shall not be considered against the state under subsections (a), (b) or (c) and shall not be used as a ground for dismissing a case or for reversing a conviction unless not considering such delay would result in a violation of the constitutional right to a speedy trial or there is prosecutorial misconduct related to such delay."

Both the text and structure of this subsection create an ambiguity in that it is not explicit whether a delay that might be initially attributed to the defendant but is later charged to the state (as referenced in the second sentence) must first be a delay requested by the defendant (as laid out in the first sentence). I would conclude, reading the statute in its entirety and considering the provision in context, that the legislature intended for the first sentence to define when the second sentence applies.

The structure of a statute often provides a clue regarding legislative intent. See *Brown*, 295 Kan. at 196 (considering structure to discern whether legislature intended to create alternative means of committing a crime); see also, *e.g.*, *Meredith v. Federal Mine Safety and Health Review*, 177 F.3d 1042, 1053 (D.C. Cir. 1999) ("[W]e find that the text and structure of the Mine Act, as well as the legislative history, inexorably lead to a single conclusion."). Typically, sentences within the same subsection relate to one another and should be read together. See *Brown*, 295 Kan. at 196. Also, courts do not consider parts of an act in isolation but are instead required to construe all parts together.

*Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 322-23, 255 P.3d 1186 (2011). This rule holds especially true when applied to words in the same subsection and, even more, to words in contiguous sentences under the canon of construction known as *noscitur a sociis*—that is, the meaning of a word is or may be known from its accompanying words.

Applying these considerations to subsection (g) suggests to me that the first sentence should be read to define the circumstances under which the second sentence operates. Thus, when both the first and second sentences refer to "a delay," they mean a delay requested by or agreed to by the defendant.

This conclusion is further reinforced by the structure of other provisions adopted by the legislature along with subsection (g). See L. 2012, ch. 157, sec. 4. Subsection (g) relates to only one of seven situations where the speedy trial limit may be either tolled or assessed to one party or the other. Other subsections address the other six situations and each provides its own rules for calculating the time. Subsection (d) relates to a defendant who absconds. Subsection (e) covers three situations:  delays that result from proceedings to determine a defendant's competency, situations where material evidence is not available, or continuances necessitated by a congested court calendar. Subsection (f) addresses what happens if a mistrial has been declared. Subsection (g), or at least its first sentence, covers a defendant's request or agreement to a continuance and codifies this court's holding that a delay because of a continuance can only be assessed against a defendant if requested or agreed to by the defendant. See *Vaughn*, 288 Kan. at 144-45. Subsection (h) applies when a trial is timely scheduled but is delayed because "a party has made or filed a motion, or because the court raises a concern on its own" motion. K.S.A. 2012 Supp. 22-3402(h). Finally, subsection (i) addresses calculation of time when "the state requests and is granted a delay for any reason provided in this statute." K.S.A. 2012 Supp. 22-3402(i).

Through these various subsections, the legislature has covered all—or at least the more common and significant—situations that cause a trial delay. And each subsection provides unique rules for assessing the delay to either the State or the defendant and for calculating the delay's impact on the speedy trial limitation. This structure suggests that each subsection has a unifying feature and signals that the legislature likewise intended the second sentence of subsection (g) to relate only to the situation where a defendant requests or agrees to a delay.

Moreover, "in interpreting statutes we frequently point to parallel statutes [or provisions] and note that the language in one statute [or provision] may illustrate that the legislature knows how to state something that is omitted in another statute [or provision]." *Cady v. Schroll*, 298 Kan. 731, 749, 317 P.3d 90 (2014). Comparing subsection (i), which relates to tolling when the State requests and is granted a delay, to subsection (g), relating to the defendant's request, is telling. K.S.A. 2012 Supp. 22-3402(i) provides:

"If the state requests and is granted a delay *for any reason provided in this statute*, the time elapsing because of the order granting the delay shall not be subsequently counted against the state if an appellate court later determines that the district court erred by granting the state's request unless not considering such delay would result in a violation of the constitutional right to a speedy trial or there is prosecutorial misconduct related to such delay." (Emphasis added).

In contrast, subsection (g) does not refer to "a delay for any reason provided in this statute" but merely to "a delay." Clearly, the legislature knew how to create a catch-all provision; it did so in subsection (i). But it did not do so in subsection (g). The majority, in effect, reads the above italicized phrase from subsection (i)—or at least the words "for any reason"—into subsection (g), in contravention of our general rule that we "will not

44

read into the statute something not readily found in it." *Cady*, 298 Kan. at 738-39. Without this added, expansive language, the second sentence of subsection (g) refers only to the delay allowed by the first sentence—a delay requested or agreed upon by the defendant.

The State's burden of ensuring compliance with the speedy trial statute may have motivated the statutory distinction between delays requested by a defendant and those charged to the State. See *State v. Adams*, 283 Kan. 365, 369, 153 P.3d 512 (2007). According to the "Supplemental Note on Substitute for Senate Bill No. 307" prepared by the Legislative Research Department, the bill that led to the 2012 amendments to the speedy trial statute "was introduced by the Senate Judiciary Committee at the request of the Kansas County and District Attorneys Association (KCDAA)." Also, given that subsections (c), (d), (e), (f), and (h) address rules for most other delays caused by a defendant, there is just no need for a catch-all clause in subsection (g). Compare K.S.A. 2012 Supp. 22-3402(d) (defendant absconds), with *State v. Hess*, 180 Kan. 472, 475, 304 P.2d 474 (1956) (stating that the speedy trial statute "'does not operate in favor of a fugitive from justice'"); K.S.A. 2012 Supp. 22-3402(e) (delays because of competency proceedings), with *State v. Davis*, 277 Kan. 309, 333, 85 P.3d 1164 (2004) (charging all delays in proceedings relating to a competency challenge, including the time between filing a motion to determine competency and the decision on the motion, and any time spent in treatment, to the defendant).

In light of these various considerations, I would conclude that the savings provision in K.S.A. 2012 Supp. 22-3402(g) applies only when a defendant has requested or agreed to a delay. Here, Brownlee had clearly and repeatedly expressed disagreement with any delays and he was not consulted about the specific continuance at issue. Without the savings provision of subsection (g), the mandate of subsection (a) applies, and

Brownlee is "entitled to be discharged from further liability to be tried for the crime charged." See K.S.A. 2012 Supp. 22-3402(a).

2. *Reversible error occurred in failing to instruct on the lesser included offense.*

In addition, I disagree with the majority's conclusion that the district court did not err in failing to instruct the jury on the lesser included offense of voluntary manslaughter.

The majority correctly identifies the stair-step analysis that controls this issue, citing *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012). Applying that analysis, the majority appropriately disposes of steps one and two by determining: (1) Brownlee objected and thus fully preserved this issue and (2) it would have been legally appropriate to have instructed the jury on voluntary manslaughter as a lesser included offense of first-degree premeditated murder. The majority then holds a voluntary manslaughter instruction was not factually appropriate. I disagree with this holding.

Under K.S.A. 2014 Supp. 22-3414(3), a lesser included offense instruction is required "where there is some evidence which would reasonably justify a conviction of some lesser included crime." In *Plummer*, we explained that a court's evaluation of whether the evidence sufficiently meets this standard is "akin" to an assessment of the sufficiency of the evidence. *Plummer*, 295 Kan. at 161-62. Given that Brownlee requested the voluntary manslaughter instruction, the district court, in applying the sufficiency standard, should have viewed the evidence in the light most favorable to Brownlee—in this circumstance, in the light justifying the instruction—and asked if a rational factfinder could have found Brownlee guilty of voluntary manslaughter. See 295 Kan. at 162.

The majority determines the evidence falls short of this standard because it did not sufficiently prove, from an objective standpoint, that Brownlee lost self-control or acted out of passion rather than reason. The majority instead concludes that a dispute between Tony "Black" Irvin and other partygoers had merely "simmered" throughout the day and into the evening. *State v. Brownlee*, ___ Kan. ___, slip op. at 29 (citing *State v. Hayes*, 299 Kan. 861, 866, 327 P.3d 414 [2014]). Granted, the evidence generally showed that for most of the evening Brownlee had remained out of the fray and had, in fact, twice tried to calm others and diffuse tensions. But the evidence also shows that this situation changed just before the shooting.

At that point, the anger escalated and several individuals, including Irvin and Brownlee, moved outside the house. According to Brownlee's sister Shaella the tension was so high that Kenneth Brinson shot the ground three times, saying, "[Y]'all gonna calm down or I'm—I'm gonna start acting crazy." Shaella then saw Irvin speak to Brownlee and heard Brownlee say that he was not going to fight, though she also testified that her sister Brandie was trying to calm Brownlee down and telling him to "stay out of it." According to Shaella, someone fired some more shots, this time into the air, and she ran upstairs. A few minutes later she came back downstairs and saw Irvin and Brownlee physically fighting each other and "rassling." Other evidence supports the conclusion that the situation involving Brownlee escalated once he was confronted by Irvin outside. Shaella testified Brandie went outside to "try[] to calm [him] down." And John Doran, as well as Shaella, testified that Irvin and Brownlee argued outside the house and that Doran stepped between them to try and break up the argument. Gunshots soon followed.

From these accounts, a rational factfinder could have found beyond a reasonable doubt that Brownlee shot Irvin intentionally upon a sudden quarrel or in the heat of passion. See K.S.A. 2014 Supp. 21-5404(a). This evidence indicates that while much of the evening's tension had been between Irvin and people other than Brownlee, once they

47

were outside things between the two of them became heated. At least one person saw Irvin say something to Brownlee that suggested Irvin wanted to fight—though Brownlee initially responded that he would not fight. But a fight began anyway.

Again, since Brownlee requested the voluntary manslaughter instruction, the district court should have viewed the evidence in the light most favorable to him and in the light justifying the instruction. See *Plummer*, 295 Kan. at 161-62. I would conclude the above-described testimony, viewed in this light, constitutes evidence of heat of passion, which we have defined to include "'"any intense or vehement emotional excitement of the kind prompting violent and aggressive action."' [Citations omitted.]" *State v. Wade*, 295 Kan. 916, 925, 287 P.3d 237 (2012); see *State v. Story*, 300 Kan. 702, 711, 334 P.3d 297 (2014) (discussing definition of "heat of passion"); *State v. Coop*, 223 Kan. 302, Syl. ¶ 1, 573 P.2d 1017 (1978) (heat of passion "'includes an emotional state of mind characterized by anger, rage, hatred, furious resentment, or terror'"). Thus, I would hold the district court erred in failing to give the voluntary manslaughter instruction.

JOHNSON, J., joins the foregoing dissenting opinion.